SHARON RILEY por sí y en representación de su hija SYLVIA PÉREZ RILEY, demandante y recurrida, *v.* DRA. EDITH RODRÍGUEZ DE PACHECO y OTROS, demandados y recurrentes.

*Números:* R-84-107 *Resueltos:* 2 de diciembre de 1987
R-84-110

766

*Alfonso Miranda Cárdenas,* abogado de los recurrentes; *Héctor M. Alvarado Tizol,* abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

"El derecho es ese sueño que no cesa de tentar el corazón al hombre. El sueño de una justicia más alta que ejerce sobre nosotros una acción poderosa y constante." M. Iglesias Corral, *El Enigma del Derecho, Libro Homenaje a Ramón Roca Sastre,* Madrid, Gráficas Condor, 1976, Vol. 1, pág. 72. Para hacer realidad ese sueño, el modelo ideal de conducta que los tribunales han de buscar "ante una actividad profesional, como la de los médicos, [es usar] el criterio objetivo del 'buen padre de familia', recogido en el Código, [que] se transforma en el criterio del *'buen profesional'* o el *'buen técnico de la medicina'.* Y tal transformación no supone en ningún caso una 'especialidad' del criterio de medida de la diligencia exigida en la actividad profesional, sino que parece más bien una *concreción del criterio genérico* contenido en el artículo 1.104 [1057 P.R.] del Código civil; lo que en definitiva no es más que la *necesaria adaptación* de las normas a las circunstancias en que han de ser aplicadas". J. Ataz López, *Los Médicos y la Responsabilidad Civil,* Madrid, Ed. Montecorvo, 1983, págs. 239–240.

Se impone una aclaración. En términos de la buena práctica de la medicina, al adjudicar este caso no pautamos una norma absoluta ni imponemos a los obstetras-

ginecólogos un criterio férreo o riguroso. Al realizar sus funciones y descargar sus responsabilidades, reconocemos que el médico tiene amplia latitud para ejercitar su criterio informado, a la luz del cuadro clínico que posee al momento de adoptar su decisión con proyección futura. Simplemente decidimos que para la época de 1975 —en este caso en particular y en la forma en que acontecieron los hechos— los médicos no actuaron con la diligencia que se les requería.

Sharon Riley, por sí y en representación de su única hija Sylvia Pérez Riley, instó demanda en resarcimiento de daños el 4 de mayo de 1976 en el Tribunal Superior, Sala de San Juan. Alegó que los demandados, la ginecóloga-obstetra Dra. Edith Rodríguez de Pacheco, el anestesiólogo Dr. Celso Víctor Zeni y el Hospital Pavía, incurrieron concurrentemente en negligencia de mala práctica médica durante el alumbramiento. La condición de la niña es de *encefalopatía anóxica*.[1] Los demandados oportunamente contestaron la demanda y negaron responsabilidad. La doctora Rodríguez de Pacheco reconvino y alegó que la codemandante Sharon Riley había organizado una campaña publicitaria dirigida a desacreditarla profesionalmente. Esta reconvención fue negada.

---

[1] La terminología describe "un daño cerebral que puede ser difuso o puede ser masivo, o sea, que puede variar fundamentalmente en cuanto a su extensión concierne y que ocurre una falla en la oxigenación cerebral del bebé en algún momento durante el proceso de su nacimiento". T. E. de 18 de marzo de 1981, pág. 173.

*Encefalopatía*: "Una enfermedad del cerebro, específicamente una enfermedad degenerativa crónica. Una enfermedad degenerativa es aquella en que el tejido afectado se deteriora." (Traducción nuestra.) J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder*, Nueva York, Matthew Bender, 1986, Vol. 2, pág. E-64.

*Anóxico*: "Marcado por anoxia, la condición anormal en que el contenido del oxígeno de las células y tejidos del cuerpo están bajo lo normal; tener menos del contenido normal de oxígeno en las células de los tejidos del cuerpo; marcado por una falta de oxígeno en cualquier sitio." Íd., pág. A-239.

La vista en su fondo tomó varios días, y en ella se desfiló abundante prueba testifical y documental. El tribunal emitió una extensa y documentada sentencia.(2) Desestimó la acción contra el Hospital Pavía y la reconvención. Sin embargo, declaró con lugar la demanda contra la doctora Rodríguez de Pacheco y el doctor Zeni. Les condenó a satisfacer a Sharon Riley $100,000 por sus sufrimientos mentales; $30,000 por concepto de pérdida de ingresos y $8,352.90 por gastos médicos incurridos en el tratamiento de Sylvia. En cuanto a esta última, les impuso la obligación de consignar $500,000 por daños físicos y $300,000 por sufrimientos morales pasados y futuros. Impuso $50,000 de honorarios de abogado más intereses desde la presentación de la demanda. La responsabilidad de la aseguradora del doctor Zeni, Puerto Rican American Ins. Co., fue hasta $200,000. A solicitud de los demandados revisamos.(3)

## I

Los hechos que nutren esta acción están relacionados con el alumbramiento de la señora Riley. Desde el 3 de diciembre de 1973 estuvo bajo el cuidado, en calidad de paciente, de la doctora Rodríguez de Pacheco. La señora Riley escogió el método psicoprofiláctico, esto es, dar a luz sin droga alguna. Era primeriza.

El récord médico prenatal llevado por la doctora Rodríguez de Pacheco de la señora Riley es deficiente.

---

(2) El tribunal, conforme lo acordado por las partes, tuvo el asesoramiento del Dr. Stanley Asencio para fines de ilustrarse en cuanto a la determinación de negligencia.

(3) Ambos presentaron sus recursos por separado. Los hemos consolidado por razones procesales obvias. En buena metodología los errores son susceptibles de ser clasificados y evaluados en cuatro grupos: (1) prescripción; (2) negligencia; (3) daños e indemnización, y (4) otros planteamientos.

La Dra. Edith Rodríguez señaló que el Tribunal Superior erró: (1) al arribar a conclusiones sobre negligencia sin establecerse la relación causal entre sus actos y los daños sufridos por la menor; (2) al aplicar la norma de responsabilidad

Carece de información fundamental referente a datos sobre su historial familiar, el embarazo y su seguimiento. Tampoco tiene memorias sobre su menstruación. No contiene apuntes sobre temperatura, pulso, respiración, estación, dilatación, borramiento, hemoglobina, azúcar y acetona. Sólo constan los análisis de sangre que están dentro de los límites normales. No se indica la posición del feto, dato que debe aparecer cada mes durante el embarazo. Los latidos fetales se reportan sin indicar su frecuencia. El tamaño del útero está registrado durante las primeras tres visitas, pero no las subsiguientes. La orina aparece negativa para albúmina en las últimas siete visitas de seguimiento. De ninguna forma surge que a la señora Riley se le hubiese hecho algún examen pélvico interno o una pelvimetría — estudio radiológico de las medidas de la pelvis— para determinar su capacidad pélvica antes del alumbramiento.

El 18 de mayo de 1974, a las 4:55 A.M., la señora Riley fue admitida al Hospital Pavía. Según el récord clínico de admisión, era primeriza, sin alumbramientos o abortos previos. La fecha tentativa para el alumbramiento era 11 de mayo de 1974. Fue admitida por orden y al servicio de la doctora Rodríguez de Pacheco. En el examen de admisión "aparecen oídos, nariz y garganta negativos, pulmones claros, corazón normal sin soplos, el abdomen con un tumor

---

profesional médica; (3) al determinar que la acción de la codemandante Sharon Riley no estaba prescrita; (4) al conceder daños excesivos y arbitrarios, sin fundamento en la prueba y sin haberse establecido relación de causalidad; (5) creerle al Dr. Juan José Hernández Cibes, cuyo testimonio estuvo plasmado de errores, parcialidad, prejuicio e interés; (6) no darle crédito a los testimonios prestados por el doctor Fernández Plá, la Dra. Edith Rodríguez de Pacheco, el Dr. Celso Víctor Zeni y la Sra. Berta Godoy; (7) conceder daños especiales no probados; (8) negar un nuevo juicio, y (9) no acceder a unas enmiendas y determinaciones adicionales bajo la Regla 43.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y a una reconsideración.

Por su parte, el doctor Zeni sostuvo que el tribunal erró al concluir que fue negligente; al no declarar prescrita la causa de acción de Sharon Riley, y al fijar daños y honorarios de abogado excesivos.

de preñez, con una altura del fundus de 3 dedos debajo del xyfoides, extremidades negativas, piel negativa, y peso ganado durante el embarazo, 8 libras". *Exhibit* 1, pág. 7. No había evidencia de toxemia ni de sangre anormal. A juicio de la doctora Rodríguez de Pacheco no había desproporción pélvica. A las 5:45 A.M., por instrucción suya, le suplieron 1,000 cc. de glucosa en agua intravenosa. A las 7:00 A.M. le suministraron 5 unidades de "syntocinón" (pitocina sinté-tica) para estimular las contracciones a través del líquido de la glucosa. Una enfermera anotó 140 latidos fetales por minuto. A esta misma hora, la doctora Rodríguez de Pacheco le rompió las membranas; del récord no surge la razón. Luego, a las 9:30 A.M., lentamente le administraron por vía intravenosa 5 milígramos de "Valium". A las 12:00 M. la enfermera hizo constar que los latidos fetales estaban bien (156 por minuto). A las 2:00 P.M. el parto estaba bastante activo. Presentaba contracciones cada 2 minutos.

En la hoja de la Sala de Partos, no se consignó pelvimetría ni la edad fetal. El tipo y prueba de compatibilidad aparecen en *blanco*.[4]

Finalmente, a las 3:30 P.M. la paciente Riley fue trasladada a la Sala de Partos. La niña Sylvia nació a las 4:12 P.M., con anestesia local, en una presentación "occito

---

[4] Se hizo constar que las contracciones eran cada 10 minutos con duración de 5 segundos y una dilatación de 1 a 2 centímetros, con una estación de menos 1 (–1). En la columna sobre la frecuencia de los latidos fetales (del corazón del feto), "a las 7:00 A.M. aparece la palabra 'OK', y después de las 7:00 A.M. *no aparecen reportados fetales algunos durante el resto del alumbramiento*". *Exhibit* 1, pág. 7. La columna referente a la *presión de sangre* aparece en *blanco. No se anotó ninguna durante todo el desarrollo del parto.* En el espacio que se supone se consignen las contracciones y el carácter del parto, sólo se figuró las 7:00 y 8:00 A.M., cada cinco minutos. No surge la duración de dichas contracciones. *Después de las 8:00 A.M.* no hay nada más apuntado.

posterior izquierdo", esto es, con la cabeza inclinada hacia el lado izquierdo de la pelvis. Pesó ocho y media (8½) libras. Respiraba con dificultad. Se le dió un *Apgar Score* de 6 —sin precisarse a cuántos minutos— indicativo de que su condición era de cuidado. Esta puntuación contrasta con la Hoja de Informe de la enfermera en que se evaluó el Índice Apgar en 15 minutos. La doctora Rodríguez de Pacheco usó tenazas tipo *Simpson mid-forceps*. La placenta salió espontáneamente completa a las 4:17 P.M.

Al instante de nacer no lloró, respiraba con dificultad y tenía secreciones abundantes y espesas. Se le cortó el cordón umbilical. Además, se le dio el tratamiento de *Credé*, esto es, le aplicaron unas gotas de nitrato de plata en los ojos. No había en ese momento anestesiólogo presente en vista de que el parto era psicoprofiláctico. En esas circunstancias, la doctora Rodríguez de Pacheco no lo creyó necesario. Tampoco se lo comunicó antes a la señora Riley.

La doctora Rodríguez de Pacheco y la enfermera obstetra comenzaron el tratamiento de emergencia. Esta última le aplicó oxígeno. Con el consentimiento de la doctora Rodríguez de Pacheco, llamó urgentemente al anestesiólogo doctor Zeni. Éste estaba en la Sala de Operaciones y se personó rápidamente. Encontró a la bebé con una depresión respiratoria y en estado cianótico moderado. Como tratamiento de resurrección le aplicó el laringoscopio,

---

En la columna correspondiente a *dilatación y borramiento*, a las 7:00 A.M., aparece reportado 5% y 2 centímetros; a las 8:00 A.M., 3 a 4 centímetros; a las 9:00 A.M., 4 centímetros; a las 10:00 A.M., 5 a 6 centímetros; a las 12:00 M., 7 a 8 centímetros; a la 1:00 P.M., 7 a 8 centímetros; a las 2:00 P.M., 8 a 8½ centímetros; a las 2:50 P.M., *anterior lip* (labio anterior); y las 3:20 P.M., *fully dilated* (dilatación completa). En cuanto a las estaciones del parto, el récord contiene la siguiente información: a las 7:00 A.M. (–1) menos uno; a las 8:00 A.M., nada; a las 9:00 A.M. (–0) a (–1); a las 10:00 A.M. (–0) a (–1); a las 11:00 A.M., 12:00 M., y 1:00 P.M. iguales; a las 2:00 P.M. (–0); a las 2:50 P.M. (0+1); y a las 3:20 P.M. (+1).

En cuanto a la presentación y posición del bebé aparece a las 7:00 y 8:00 A.M. *vertex*.

succionó las secreciones y le puso una mascarita de oxígeno que infla los pulmones. No la intubó para extraerle el meconio. El procedimiento duró menos de un minuto, alivió temporeramente a la bebé, que empezó a respirar normalmente. El doctor Zeni continuó observándola brevemente hasta que se cercioró que en esos instantes la respiración era normal. Decidió entonces marcharse. Durante su intervención ocurrió un incidente, al que habremos de referirnos más adelante, con el padre de la niña, Sr. Cristino Pérez Febo. Poco después la criatura volvió a experimentar dificultad al respirar. Un pediatra atendió la llamada de emergencia. Subió a la Sala de Partos y se confrontó con que estaba en peligro respiratorio con retracciones, un quejido y levemente cianótica. Estas características son de asfixia neonatal. De su nota en el récord surge información de que se le había aplicado oxígeno. Este pediatra la trasladó al Salón de Infantes y la entregó *agudamente enferma* al Dr. Ángel Rodríguez Rodríguez para manejo.

De acuerdo con el récord de la recién nacida, su madre Sharon no había sufrido complicaciones durante el embarazo. La duración de la gestación fue a término. Se estimó como fecha probable para el alumbramiento el 11 de mayo de 1974. No existe anotación en cuanto a la duración del parto activo. Según anotado, las membranas fueron rotas artificialmente y la presentación y posición era de *left occiput posterior* (l.o.p.).

Según la prueba y el foro de instancia, la niña Sylvia experimentó anoxia cerebral durante el parto, lo que ocasionó que naciera con apnea, cianótica y en malas condiciones generales. Requirió resucitación. Aunque luego logró respirar temporeramente, volvió a sufrir dificultad respiratoria retrayendo y se tornó cianótica. Cinco o seis horas después de nacida, Sylvia desarrolló convulsiones crónicas con cianosis y continuó convulsando en los días

siguientes. Ello provocó que las suturas craneales se separaran más de lo normal debido a que se le hinchó el cerebro. Tenía un edema cerebral.

Las órdenes médicas de ingreso de la bebé del día 18 indicaban que se le pusiera en una incubadora con temperatura de 36 grados centígrados, y de ser necesario, se le supliera oxígeno a base de un 40%; que se le pusiera bajo observación por cualquier problema respiratorio; que se tomaran radiografías del pecho, y se le administraran determinados antibióticos. Posteriormente, la placa reveló el siguiente resultado: "el campo pulmonar es negativo, el tamaño del corazón normal y la circulación pulmonar no es marcada." (Traducción nuestra.) El 19 de mayo Sylvia padeció tres convulsiones antes de las 3:45 P.M. Fueron descritas del siguiente modo: "Se puso trinca, cianótica con movimientos repetidos de las extremidades." Durante la visita tuvo otra de esas convulsiones. Se procedió entonces a ordenar una prueba de azúcar en la sangre por medio de un *dextrostick*, que reveló que sufría de hipoglicemia. A las 5:00 P.M. del mismo día repitió otra convulsión. Luego se intentó hacerle una punción lumbar sin éxito. Posteriormente, a las 9:25 P.M. se consignó que la bebé había seguido con las convulsiones.

El 20 de mayo de 1974, a las 9:00 P.M., Sylvia sufrió una convulsión que el neurólogo especialista, Dr. Eduardo Mirabal Font describió así: "Viró los ojos hacia el lado izquierdo, levantó el brazo, dejó de respirar, tuvo bradicardia y duró esta convulsión 1 minuto y medio." Según el foro de instancia y prueba, la niña tuvo convulsiones multifocales en varias ocasiones relacionadas con el edema cerebral e hipoglicemia. El edema cerebral y la hipoglicemia fueron directamente causados por la anoxia cerebral sufrida durante el parto, agravada por la falta de tratamiento a tiempo que culminó en una encefalopatía anóxica. Surge del récord que el 21 de mayo

de 1974 la niña tuvo tres convulsiones más entre las 7:00 A.M. a 3:00 P.M. A partir del 22 de mayo comenzó a mostrar mejoría y subsiguientemente cesaron las convulsiones. Ese curso continuó y el 31 de mayo fue dada de alta.

Con este trasfondo evaluamos los señalamientos de error según antes agrupados.

## II

*Prescripción*

Tanto la doctora Rodríguez de Pacheco como el doctor Zeni insisten que la acción de la señora Riley estaba prescrita. El ilustrado foro de instancia sostuvo lo contrario. El error no fue cometido. Sin que fuera contradicha, la prueba reveló que la madre continuó recurriendo al consejo del doctor Mirabal Font en vista de los síntomas de la bebé. No fue hasta septiembre de 1975 que la señora Riley supo que la condición de su hija Sylvia se debió a un daño cerebral sufrido durante el alumbramiento. En esa fecha, el doctor Mirabal Font se lo informó al estar seguro de esa conclusión luego de innumerables pruebas. Así lo atestiguó este prestigioso facultativo. Antes la señora Riley sólo conocía la condición.

En estas circunstancias es aplicable la doctrina establecida en *Colón Prieto* v. *Géigel*, 115 D.P.R. 232, 246–247 (1984), en el sentido de que el término es desde ese conocimiento. "La posición señalada es la más justa y equitativa. Salvaguardamos el derecho de reclamar del perjudicado y no premiamos a aquel que, habiendo causado el daño, se refugió en la confianza e ignorancia de su paciente para beneficiarse y derrotar la acción. 'Por lo demás, al perjudicado, para ejercer la acción, *no le basta saber que lo ha sido, sino precisa conocer quién es el autor del daño, para poder dirigir la demanda contra él, saber a quién*

*debe demandar*; por lo cual, a la noticia del daño ha de añadirse la del que lo causó, para que corra la prescripción.' A. Borrell y Soler, *Derecho Civil Español*, Barcelona, Ed. Bosch, 1955, T. I, Parte General, pág. 500. Véanse: M. J. Argañarás, *La Prescripción Extintiva*, Buenos Aires, Ed. Tea, 1966, pág. 245; L. Enneccerus, *Tratado de Derecho Civil*, Barcelona, Ed. Bosch, 1966, T. II, Vol. 2, 2da parte, pág. 1163." (Énfasis suplido.)

En su resolución de 26 de septiembre de 1978, el foro de instancia aquilató la prueba documental y el testimonio del doctor Mirabal Font. Además resolvió "que en este caso en particular la parte demandante tuvo conocimiento del daño en septiembre de 1975, en ocasión en que el Dr. Mirabal Font informara a la demandante de ello". Debemos respetar la conclusión del tribunal de origen. Tiene amplio apoyo en la prueba desfilada respecto a la prescripción. No se nos ha demostrado que existan circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto que justifique nuestra intervención. *Sánchez Rodríguez* v. *López Jiménez*, 116 D.P.R. 172 (1985); *Pérez Cruz* v. *Hosp. La Concepción*, 115 D.P.R. 721 (1984).

### III

*Negligencia*

Del mismo modo, la prueba sólidamente señala la conclusión sobre negligencia. Explorémosla detalladamente.

*Primero*, el *Récord Prenatal* e *Informe del Parto* (*Labor Report*) no están debidamente complementados. Omiten información esencial e importante. ¿Cuál es la consecuencia de esta omisión? A tal efecto el testimonio pericial del Dr. Juan J. Hernández Cibes expuso:[5]

---

[5] Este perito, al explicar la importancia de la pelvimetría expresó: "...Riley dijo aquí en su testimonio que se le había puesto un aparato que parecía unas

Yo entiendo que el juicio clínico que se ejerce sobre los casos y específicamente el juicio clínico que era necesario ejercitar sobre este caso específicamente dentro del marco de los hechos como sucedieron y como eventualmente podían incluso pronosticarse que iban a suceder, el juicio clínico no podía ejercitarse porque estaba totalmente carente de una información que es básica y esencial al ejercicio de ese juicio clínico. O sea, uno no ejercita su juicio clínico en un vacío, uno lo ejercita dentro de unos hechos. Los hechos en este caso brillan por su ausencia, no hay una pelvimetría, no hay un historial adecuado, no hay un r[é]cord prenatal que anticipe la probabilidad de problemas en esta paciente, no hay la mensura de la pelvis clínica anotada para los efectos de poder saber c[ó]mo era en una ocasión y c[ó]mo ha cambiado ahora, no hay una anotación histórica dentro de la admisión de la paciente que verdaderamente pueda permitir el ejercitar un juicio clínico sabiamente, no se aprovecha la oportunidad de que la paciente estaba hospitalizada nuevamente para la mensura radiológica, se rompe fuente artificialmente sin que haya una razón que explique el porqué se rompe fuente, y esto es una cosa que uno anota regularmente en el r[é]cord, mire, se rompió fuente por esta razón a tal hora. Igualmente no hay una explicación razonable de por qué un paciente que estaba progresando a todas luces hasta el momento adecuadamente se le dá pitocina según se le dio a esta paciente, no hay anotación ninguna que pued[a] explicar qué razón puede haber justificado el tomar esa medida que se tomó a esos efectos. No hay el conocimiento específico de que esta paciente tiene una pelvis contraída, y de que está contraída precisamente en aquel plano en el cual le va a

pinzas de coger hielos uno en un lado de la cadera y otro en el otro lado de la cadera y que se le había dicho que esas eran las medidas y que no debía engordar mucho. Si esa fue la única mensura que se tomó, estamos hablando entonces de las medidas que se tomaban anteriormente para los tiempos de la Reina Victoria, con un aparato que medía, lo que se llama el conjugado externo de Baudelocque, a través del cual se hacen unos c[ó]mputos y unos cálculos para después sacar otro tipo de conclusiones. Ese no es el tipo de examen que hoy día se hace dentro de la práctica de la obstetricia para medir clínicamente la pelvis." T.E. de 17 de marzo de 1981, pág. 98. Véase Hellman & Pritchard, *Obstetrics*, 4ta ed., Nueva York, Prentice Hall, 1971, págs. 302–321.

impedir rotar como rota normalmente un parto normal que viene por vías cefálicas. Yo entiendo que un juicio clínico ejercitado en esta forma, un juicio clínico ejercitado incluso sin tomar ni siquiera las más mínimas precauciones en cuanto a la obtención de los datos necesarios para llevar a cabo estos procedimientos, un juicio clínico que se ejercita presuntamente por declaración del esposo que estaba allí en la Sala, aunque se ha atestiguado en lo contrario, estando ausente de la Sala de Partos el obstetra o la obstetra por equis número de horas durante el parto, un juicio clínico que se toma en base a cuatro, en realidad, latidos fetales porque se le tomó uno al momento de admisión, y esos cuatro latidos fetales son tomados todos por enfermeras que pueden ser muy duchas en escuchar latidos fetales y contarlos pero no necesariamente en este caso específico, bajo las circunstancias en que este caso se está desenvolviendo, no necesariamente mostraron la suficiente preparación como para interpretar y anticipar la posibilidad de una problemática como la que eventualmente surge, como la súbita anoxia, el paso de meconio y otros factores que hemos discutido ya previamente con una aplicación inconsulta de f[ó]rceps, y posteriormente los eventos que también están relacionados con otros médicos que intervinieron con el caso. Mire, eso no es un juicio clínico ejercitado verdaderamente con fundamento; eso es un juicio clínico ejercitado casi, casi por una cuestión mecánica; no había fundamento previo. T.E. de 7 de abril de 1981, págs. 135-137.

En resumen, la negligencia envuelta en el período *prenatal* consistió en no ordenar determinados exámenes e infringir el deber de complementar adecuadamente el récord correspondiente a esta etapa. Ello dificultó y no permitió el análisis y los diagnósticos comparativos ulteriores. En particular se destaca la ausencia de estudios radiológicos y de laboratorios que permitieran observar el progreso del embarazo.

A una conclusión similar llegamos en cuanto a la insuficiencia del récord *durante* el parto. Sobre todo, no

haber ordenado una pelvimetría radiológica y haber omitido anotar regularmente los latidos fetales y su frecuencia, constituyen omisiones inexcusables. Impidió conocer información valiosa sobre la sensibilidad y sabiduría del parto vaginal.([6]) Es necesario que la profesión médica y el personal paramédico de los hospitales cobren consciencia de todas las implicaciones médico-legales de los records.

---

([6]) Los escasos elementos en la hoja de exámenes durante el parto son de poca utilidad. A partir de las 7:00 A.M. no hay anotación alguna de los latidos fetales ni de la presentación y posición del feto. Desde las 9:00 A.M. tampoco la hay sobre las características y frecuencia de las contracciones.

Según el tribunal de instancia, "[hubo] una progresión en la dilatación del cuello s[u]mamente irregular para lo que se esperaría en una primeriza en trabajo de parto, de acuerdo con los estudios que Friedman hizo y que se utilizan como los estudios que dan pié [sic] a la validez de lo que se llama la curva de Friedman, en el parto de la primeriza exclusivamente. A las 7:00 A.M., la paciente aparece con dos (2) centímetros de dilatación y dos (2) horas más tarde aparece con cuatro (4) centímetros de dilatación; a las 10:00 y a las 11:00 se mantiene de 5 a 6 centímetros de dilatación y todo [e]sto recordando que está siendo estimulada con agentes estimulantes [sic] de la contracción uterina. Desde las 7:00 A.M. hasta la 1:00 P.M. no hay cambio en el descenso de la parte del bebé que presenta describi[é]ndose siempre como (–1) menos uno (same); ... 12:00 del mediodía hay una rápida dilatación de 7 u 8 centímetros que se mantiene a la 1:00 P.M. y que casi es la misma a las 2:00 P.M., señalándose a las 2:50 P.M. que s[ó]lo se palpa el labio anterior del cuello, y a las 3:20 P.M. estaba en dilatación completa, y en este momento la parte del bebé que presenta todavía no se sabe cuál es, está en +1, o sea, un centímetro por debajo del diámetro más estrecho que debe cruzar pero ciertamente muy lejana en su accesibilidad a lo que se define como un 'OUTLET FORCEPS' (de estrecho exterior).... [D]urante todo este tiempo del desarrollo del parto en la anotación de enfermería del d[í]a de admisión solamente hay un señalamiento a las 9:30 A.M. de que se administraron 5 mil[í]gramos de Valium a la paciente, a las 12:00 P.M. una nota de la enfermera señalando que los fetales estaban bien, y seguidamente un apunte de 156 por minuto y que en ese momento se sondea a la paciente para vaciar la vejiga.

"El progreso de este parto carece de datos en cuanto a su dilatación, la ausencia de conocimiento de qué parte del bebé estaba presentando y el hecho de que, por lo menos según aparece en las anotaciones en la hoja de ex[a]men de parto solamente llega a +1 cuando ha dilatado totalmente, fu[e] un progreso que debió haber hecho sospechar a la Doctora Rodríguez de Pacheco a través de todo el curso del mismo, si [é]ste hubiese sido seguido en la forma que se necesitaba, la posibilidad de que la acomodación entre la parte del bebé que presentaba y la pelvis tuviese dificultades indicando un estudio radiográfico de la misma." *Exhibit* 1, págs. 16–18.

H.L. Hirsh, *Medicolegal Implications of Medical Records*, Legal Medicine Annual 171 (1975); O'Sullivan P.D., *Evaluation of the Medical Record*, 21 Med. Trial Tech. Q. 249–270 (1974). "En el pasado hemos reprobado con preocupación la laxitud en el mantenimiento del récord médico. Hemos de insistir. Ello mengua su efectividad como instrumento útil para informar con exactitud el cumplimiento de las órdenes del médico, *y como fuente de referencia para la evaluación del tratamiento, la atención y cuidado administrado al paciente. López* v. *Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197, 216–217 (1978). Más aún, hemos atribuido consecuencias jurídicas a dicha omisión '[e]n vista de la falta casi total de credibilidad que nos merecen los r[e]cords presentados en evidencia; ... éste es un caso en el cual corresponde hacer ... [una] inferencia que hace aplicable la regla de *res ipsa loquitur*'. *Oliveros* v. *Abréu*, 101 D.P.R. 209, 230 (1973). *La falta de dichas anotaciones en el récord no necesariamente constituye negligencia per se. Sin embargo, dicha omisión puede ser factor a considerarse en la credibilidad que el médico merezca respecto al tratamiento que dio al paciente. Reyes* v. *Phoenix Assurance Co.*, 100 D.P.R. 871, 880–881 (1972)." (Énfasis suplido.) *Pérez Cruz* v. *Hosp. La Concepción*, supra, págs. 731–732.

*Segundo*, aunque su uso per se para la época de los hechos no era negligencia, la forma en que se utilizó la pitocina, —"preparado casi puro de oxitocina", *Benson, Diagnóstico y Tratamiento Ginecoobstétrico*, México, Ed. Manual Moderno, 1979, pág. 685— en ausencia del récord, deja mucho que desear. Veamos. Sobre el particular, el testimonio del perito Dr. Silvio Vélez Estrada es revelador.

[L]a pitocina misma pudiera estar envuelta en y [ser la] causante de la *asfixia neonatorum*,[7] irrespectivamente de cómo se haya usado. La pitocina misma puede causar estrangulación de los vasos sanguíneos que van del feto ... de

---

[7] *Asfixia Neonatorum*: "Se utiliza para describir el fracaso de un recién nacido en respirar inmediatamente después de nacer. Hay muchas razones, unas

la placenta ... perdóneme, de los vasos sanguíneos de la madre hacia la placenta, y eso implica que el bebé en ese momento la oxigenación se para.... Esos vasos sanguíneos quedan estrangulados ya que pasan a través —entremedio— de los músculos mismos del útero y al traer una contracción por cada contracción que tiene el útero a través de la misma pitocina pues la oxigenación no es suficiente. Y dentro de este contexto de la asfixia *neonatorum* misma la pitocina puede ser —y aunque el rol del neonatólogo no es bregar directamente con la madre desde el punto de vista obstétrico— para el neonatólogo es sumamente bien importante ese detalle, sin tener que inmiscu[i]rse en problemas de carácter obstétrico, pero eso es un detalle muy importante en el historial, y muy relevante en este caso.

[Esto se agrava al tratarse de una pelvis contraída, pues] va a imposibilitar el nacimiento del bebé, [p]or consiguiente ... el trauma y la anoxia de carácter intrauterin[o] va a ser mayor. T.E. de 8 de abril de 1981, págs. 52–53.

La prueba demostró que se han esbozado ciertas precauciones necesarias antes de utilizar la pitocina. La primera precaución es que debe haber una verdadera disfunción hipotónica sin ningún progreso de parto, con el parto prácticamente detenido. En cuanto a esta precaución, según los hechos particulares de este caso, el doctor Vélez

---

resultantes de condiciones antes del nacimiento y otras después. Algunas son resultado de complicaciones de la madre. Algunas complicaciones debido a los efectos de drogas suministradas a la madre antes del nacimiento o daño causado al recién nacido durante el parto o nacimiento. Algunas complicaciones son resultado de anormalidades del propio bebé. Entre las condiciones maternales que pueden ser responsables son enfermedades dentro de ella, contracciones anormales o infecciones de la matriz, enfermedad de la placenta, anormalidad o compresión del cordón umbilical y hemorragia de la matriz. Las drogas suministradas a la madre pueden impedir que respondan los centros que inician el respirar. La mala respiración puede deberse a aspiraciones de sangre y secreciones en el canal o a defectos en el desarrollo del infante. El corazón puede ser anormal o puede haber anormalidades en los pasajes respiratorios o defectos en el desarrollo del cerebro. Enfermedad en el recién nacido que envuelvan sangre o los pulmones pueden interferir con una respiración adecuada." (Traducción nuestra.) Gray, *Attorney Textbook of Medicine*, 3ra ed., Nueva York, Matthew Bender, 1986, Vol. 4A, pág. 206.25.

Estrada atestó que era obvio —por la anotación existente en el expediente— que no había ocurrido disfunción uterina. Según la descripción de la doctora Rodríguez de Pacheco, la señora Riley estaba con contracciones activas de parto. La paciente había borrado a las 7:00 A.M. un cincuenta por ciento (50%) y seguía un curso más o menos normal en cuanto a su parto concierne. Tenía contracciones

...cada cinco minutos de acuerdo con los propios records, los fetales están normales y lo único que hay es que está menos uno (–1), pero en ese momento[,] pues[,] no podríamos establecer qué significaba eso. Pero en ese momento se le rompe [la] membrana y se le d[a] pitocina, no hay una disfunción hipotética. Una disfunción hipotética es sencillamente donde el parto —según se describe aquí— o se detiene o deja de progresar, lo cual por las descripciones que se hacen no es lo que está sucediendo....

El segundo requisito..., "[e]l paciente debe estar en verdadero trabajo de parto, no debe estar en parto falso, ni debe estar en parto prodrómico. Podríamos establecer una ecuación entre el "prodromal labor" o parto prodrómico y quizás la fase latente del parto que describe Friedman. O sea, que son sencillamente esas primeras horas en las cuales se están estableciendo las contracciones regulares.... Ese es el prodroma del parto; que es diferente a un parto falso donde en realidad no hay porque no hay un efecto sobre el cuello, ni la dilatación, ni hay otras cosas presentes que usualmente acompañan al parto. La única evidencia válida de parto es el borramiento y la dilatación progresiva del cuello. A pesar de que el proceso puede haberse detenido debe haber progresado hasta la extensión de que tres o cuatro centímetros de dilatación deban estar presentes. Una de las equivocaciones más comunes en la obstetricia es tratar de estimular el parto en pacientes que no están de parto en absoluto. La oxytocina en estos casos solamente llevará a problemas.... Tampoco se cumple con la segunda precaución . . . [p]orque tenía dos centímetros al comenzar a bajarle la pitocina ... [que d]ebe haber llegado a por lo menos de tres a cuatro centímetros....

El tercer requisito..., "[n]o debe haber obstrucción mecánica para un parto a salvo, según determinado por tod[a] la evidencia accesible, incluyendo estudios roentgenológicos, entiéndase pelvimetría radiográfica de la pelvis y de la cabeza fetal .... [E]n ocasiones puede haber una contracción de la pelvis media o puede haber una presentación de frente que no sea diagnosticada".... [No se cumplió no surge] ... una sola idea de cuál es el tamaño del feto, ni de cuál es la capacidad de la pelvis. . . .

La [cuarta] precaución ... "[l]a oxytocina no debe ser utilizada en casos de sobredistensión del útero, como por ejemplo aquellos en los cuales el infante aparenta pesar en exceso a cuatro mil gramos...." [S]i no se cumplió con la precaución número tres, que fue determinar el tamaño de la cabeza fetal, pues obviamente tampoco se cumplió con la cuarta precaución que es la de evitar el uso de la oxytocina en un útero sobredistendido .... [L]a quinta precaución..., "[p]aciente de gran paridad, o sea, para cinco o más, . . . es una paciente que ha dado a luz un niño a término y vivo cinco veces o más. En general no se les debe dar pitocina porque sus úteros se rompen mucho más fácilmente que aquellas pacientes que tienen una paridad inferior. Por la misma razón debe evitarse su uso en pacientes mayores de 35 años de edad. En este caso específico[,] pues[,] esta precaución no aplica porque la paciente no es multípara, la paciente no era mayor de 35 años de edad al momento en que ocurrieron los hechos; de manera que no tiene relación en realidad["].

La sexta condición o precaución es que la condición del feto debe ser buena, según se evidencia por un latido fetal regular y la ausencia de líquido amniótico manchado de meconio.... Entendemos que este caso [no] llena tam[poco] las precauciones en el sentido de que no tenemos, a excepción de la primera toma, el número o los latidos regulares del feto con dos excepciones adicionales ... cuando se le empezó la pitocina, que tenía 140 por minuto..., a las doce del medio día en esa misma página nuevamente hay una lectura de latidos fetales que se cuentan o los informan como 152 por minuto. Y a las dos de la tarde, a pesar de que dice latidos fetales bien, no señala específicamente el número de latidos fetales por minuto, o sea, todo lo que dice es "bien". Entremedio hay un

señalamiento a los efectos de que las contracciones uterinas están ocurriendo cada dos minutos. T. E. de 18 de marzo de 1981, págs. 231-239. Véase Hellman & Pritchard, *op. cit.*, págs. 844-849.

En síntesis, la doctora Rodríguez de Pacheco incurrió en negligencia cuando, sin conocer las características del canal que debía atravesar la criatura por nacer, añadió al suero intravenoso —a la vez que rompía fuente— cinco (5) unidades de la substancia Syntocinón que estimula las contracciones del útero.

*Tercero*, en el récord no aparecen los signos fetales apuntados de manera periódica. La información es crucial, la omisión una falla inexcusable; era necesario para determinar si durante el parto la niña estaba en peligro fetal (*fetal distress*). Es unánime el criterio médico de que los latidos fetales son de incalculable valor diagnóstico durante el parto. B.J. Ficarra, *Surgical and Allied Malpractice*, Illinois, C.C. Thomas, 1968, pág. 394. Es el medio para conocer el carácter, la regularidad, la tonicidad y la fuerza con que se escuchan. También es importante el número de palpitaciones del feto a través del parto, y cómo responde el feto antes de una contracción y después de una contracción. T.E. de 17 de marzo de 1981, pág. 166.

Otra vez el doctor Vélez Estrada nos explica que a través de los tiempos estos latidos fetales se han tomado cada quince minutos y puede en ocasiones oírlos ahora y quince minutos después no. A esto se debe el desarrollo de los monitores. Expongamos su testimonio:

[Los signos fetales son importantes porque n]os dan información respecto, número uno, a si hay una compresión por anoxia del cordón umbilical o de falla en la situación placentaria y nos dice también cómo responde ese feto a esa ... por eso es que originalmente uno siempre las toma cada quince minutos, o las tomaba en el pasado, porque tenía un intervalo más corto en el cual uno podía buscar cómo

respondía el feto. O sea, el feto normalmente debe ... usualmente baja un tanto el número de latidos por minuto durante la contracción, precisamente porque baja el flujo de sangre y la oxigenación al cerebro. Cuando la contracción se relaja regresan y retornan dentro de los límites normales, una buena oxigenación y una buena circulación placentaria, y a lo mejor pues no hay compresión umbilical y sencillamente el feto responde antes de que ocurra la otra contracción con una cierta rapidez a volver nuevamente a sus latidos normales. Ejemplo, un feto puede estar teniendo 144 por minuto de latidos.... [el e]jemplo, una ... un feto normalmente podría tener unos fetales de 144 por minuto, viene la contracción, es una contracción fuerte y eso puede descender hasta 130, 128, y entonces tan pronto como empieza a relajarse el útero —que vuelve la circulación nuevamente a fluir— pues nuevamente sube a niveles de 140 o 144.... [E]n los estudios que se han hecho por ejemplo el Dr. Horn, el doctor Caldeyro Barcía, en Uruguay, establecieron que había una seguridad que no era indicativa del sufrimiento fetal entre esos ... entre esas cantidades, 120 a 160. Ahora, cuando descienden de 120 ya empiezan a considerarse entonces con mayor cuidado, sin que necesariamente hoy día entendamos que hay que salir rápidamente a terminar el embarazo porque le va a pasar algo al feto. Podría ser ... que la paciente se recostó del lado derecho.... [E]so implica de inmediato el que uno tiene que hacer unas determinaciones, como por ejemplo darle oxígeno a la madre a cierto número de "litros" por minuto, y debe recostarla sobre su lado izquierdo, debe tratar de determinar por qué razón el feto está bajando los fetales, si es posible, y a eso pues se puede referir si hay unas anotaciones hechas en r[é]cord. Eventualmente tanto el doctor Caldeyro Barcía como el doctor Horn han determinado que una vez los fetales descienden a un nivel menor de 110 en un caso o 100 en el otro, porque varían en sus opiniones, ya entonces estamos en ... [un] sufrimiento fetal. Igualmente ocurre cuando esto sobrepasa el nivel de 160 con una diferencia; la taquicardia fetal, o sea, el que suban por encima de 160 no es tan significativo en términos de sufrimiento fetal y en términos de la necesidad, que en ocasiones es sencillamente inminente y rápida de

intervenir, no es tan significativa como lo es la bradicardia, o sea, que bajen los fetales y pueden llegar hasta 180 y quizás todavía ahí uno pues estaría pensando en darle oxígeno, en observar y examinar y posiblemente incluso pues le mandaría —si no se le ha hecho ya[—] una pelvimetría, un estudio de otro tipo, etcétera. O sea, que hacia arriba la connotación no es tan ... tan significativa como cuando hay un descenso. T.E. de 17 de marzo de 1981, págs. 169-173.

 El *cuarto* elemento de negligencia, dentro de las circunstancias particulares de este parto, fue la utilización de los fórceps.[8]

---

[8] Nuevamente el testimonio del doctor Vélez Estrada es ilustrativo:

"Entramos luego en el tipo de alumbramiento y dice si fue espontáneo o fue inducido y no menciona el hecho.... [S]í, perdóneme, lo menciona, está bien.... [S]e aplicaron los f[ó]rceps, esos f[ó]rceps los describe como [*low forceps*] y que el tipo de f[ó]rceps que usó fue Simpson. Esto añade otra problemática a la conducta del parto de esta señora desde el punto de vista de la neonatología, y viendo que yo tengo una bebé que está teniendo dificultades al nacer, que en adición durante la conducta del parto hay unos fetales que van en aumento, que está siendo manejada a través de pitocina, se le está dando una medicina que contrae la musculatura del útero, interrumpiendo la oxigenación fetoplacentaria y que en adición se aplican unos f[ó]rceps, un paciente que como conocido es que demostró meconio, que demuestra que este paciente o esta bebé sin lugar a dudas tuvo una anoxia de carácter intrauterin[o], no cabe en mi mente duda alguna por el hecho de haber pasado meconio en una presentación de [*vertex*], desde el punto de vista de neonatología sufrió angustia de carácter respiratori[o]. Y en adición se aplican unos f[ó]rceps donde su aplicación —como se hiciera— pudiera inducir a más trauma de carácter craneocerebral y la hipoxia, anoxia cerebral que pudiera tener este bebé pudiera ser aumentada. Y vemos *que estos f[ó]rceps fueron aplicados, los low forceps, en una posición en la cual por definición no aplica la definición de low forceps, hubo que hacer compresión* adicional desde el punto de vista de la neonatología —y me suscribo a que no soy el obstetra, soy meramente neonatólogo— indica que hay que apretar un poquito más la cabeza en una posición anormal de aplicación de los f[ó]rceps y este puede inducir trauma craneocerebral. Imaginemos que este bebé no tuvo ningún problema de carácter respiratorio inicial y que hubiera sido un parto completamente natural, el mero hecho de la aplicación de los f[ó]rceps en una posición de esa manera implicaría una posibilidad —en términos de pronóstico— aunque sea mínimo, de un daño de carácter craneocerebral. Y un neonatólogo tiene que considerar todas esas alternativas." (Énfasis suplido.) T.E. de 8 de abril de 1981, págs. 124-126.

▋ *Quinto*, la doctora Rodríguez de Pacheco, según el curso que se desarrolló, no tomó las medidas pertinentes para afrontar los riesgos y complicaciones del parto. La ilustrada sala sentenciadora concluyó:

Bajo las circunstancias de este caso, la Dra. Rodríguez de Pacheco debió haber previsto para la presencia de un anestesiólogo o anestesista, adeptos en la intubación endotraqueal de infantes y el equipo de enfermería con las facilidades necesarias para la atención rápida del bebé en caso de que hubiese que restaurar las vías respiratorias, el control de temperatura y otras condiciones; que cuando la crisis sobreviene super impuesta súbitamente sobre un sufrimiento que ha venido ocurriendo por un tiempo, se puede actuar de inmediato, cada cual cumpliendo con la labor o tarea que le sea asignada en ese esquema de tratamiento. En este caso no hubo servicio de anestesia ni siquiera por una enfermera anestesista al momento de nacer la niña Sylvia Pérez Riley. Se pasó prueba al efecto de que los hospitales mantienen un equipo de guardia que puede estar en el hospital y presentarse al mismo rápidamente para dar los servicios necesarios. Ni siquiera hubo esa excusa en este caso, por cuanto la paciente Sharon Riley se pasó a la Sala de Partos a las 3:30 P.M. y todavía no se había acordado la cirugía electiva, encontrándose anestesiólogos en la Sala de Operaciones adyacente a la Sala de Partos.

Si se hubieran anticipado los problemas se pudo haber tenido ese anestesiólogo en la Sala de Partos al momento de tratar de sacar al bebé con lo que fue erróneamente llamado unos "f[ó]rceps externos", y posteriormente unos "f[ó]rceps bajos" a un bebé comprometido por la evidencia que nos da el paso del meconio. *Exhibit* 1, págs. 20–21.

Y *sexto*, la manera pobre e incompleta en que se informó el Índice Apgar (*Apgar Score*)(9) de la niña. No aparece un número en cuanto al Índice Apgar. No se dice cuándo fue

---

(9) Índice Apgar: Describe un sistema desarrollado por la anestesióloga Dra. Virginia Apgar, para medir las siguientes cinco características de un recién nacido, al minuto y a los cinco (5) minutos: (a) latidos del corazón; (b) color de

tomado. Ello provocó que el pediatra o el neonatólogo no contaran con una información vital para el manejo del bebé. (T.E. de 8 de abril de 1981, pág. 37.)

█ La buena práctica de la medicina establece el deber de todo médico de informar el número de Índice Apgar al minuto y constatar que así se haga esa evaluación.([10])

---

la piel; (c) capacidad para responder a estimulación con los reflejos presentes al nacer; (d) calidad y frecuencia de su llanto comparado con un bebé normal, y (e) existencia o no de color azul en la planta del pie o en las palmas de las manos. "La valoración inmediata del recién nacido a los 1 y 5 minutos después del nacimiento es un procedimiento sistemático valioso (cuadro 36-1). El recién nacido en su mejor estado (índice Apgar 8-10) es robusto, de color rosado y con llanto. Un lactante moderadamente deprimido (índice Apgar 5-7) está cianótico, con respiraciones lentas e irregulares, pero tiene buen tono muscular y reflejos. El lactante intensamente deprimido (índice Apgar de 4 o menos) se encuentra flácido, pálido o azulado, apnéico y tiene frecuencia cardiaca baja. El índice Apgar a los 5 minutos es un indicador útil del pronóstico neonatal y a largo plazo."

"*Cuadro 36-1. Valoración del lactante al nacer (índice Apgar). A los 1 y 5 minutos después del nacimiento completo del producto (independientemente del cordón y la placenta), deben observarse y registrarse los siguientes signos objetivos*:

| Puntos | 0 | 1 | 2 |
|---|---|---|---|
| 1. Frecuencia cardiaca | Ausente | Lento (<100) | >100 |
| 2. Esfuerzo Respiratorio | Ausente | Lento, irregular | Bueno, llanto |
| 3. Tono muscular | Flácido | Algo de flexión de extremidades | Movimientos activos |
| 4. Respuesta al catéter, sonda en nariz (después que la orofaringe ha sido aspirada) | Ninguna | Gesto | Tos o estornudo |
| 5. Color | Azul o pálido | Rosado, extremidades azules | Rosa por completo" |

Benson, *Diagnóstico y Tratamiento Ginecoobstétricos*, México, Ed. Manual Moderno, 1979, págs. 763–764.

([10]) "Es bien importante conocer la evaluación del minuto.... [N]os va a determinar qué dificultad inmediata intrauterina ha tenido ese bebé [y proyectar] la magnitud de la interferencia. El apgar de los cinco minutos va a determinar el pronóstico de cómo va a afectar a ese bebé en un futuro determinado. Si nosotros comparamos digamos por[centajes] en términos de la cantidad de daño que haya

De los autos no se desprende con claridad el momento en que se tomó el Índice Apgar. En el encasillado correspondiente no se hizo. Ante esta dificultad, el tribunal de instancia concluyó que fue dado a los 15 minutos. Fundamentó su determinación en la hoja de la enfermería, que bajo *Apgar Score*, se hizo constar 15 minutos. Según este dato, claramente la niña estaba en bastante mal estado en ese momento. La prueba es consistente y sostiene esta apreciación.

■ Recapitulando, la prueba según aquilatada por el foro de instancia —y evaluada independientemente por este foro, incluso los testimonios periciales y la prueba documental (libros y revistas)—([11]) sostienen ampliamente la negligencia de la doctora Rodríguez de Pacheco resumible así: 1. cuidado prenatal inadecuado; 2. conducción de la pitocina inapropiada sin llevar los parámetros requeridos para el uso de la misma, como por ejemplo, la

---

tenido un bebé por ejemplo de un apgar dentro de los uno a tres, y vamos a encontrar que si evaluamos el apgar del primer minuto podemos tener una valoración de tres más o menos de 3.4 po[r c]iento de daño cerebral, y si esa misma valoración entre uno a tres lo evaluamos a los cinco minutos esa valoración se duplica a un 7.4 po[r c]iento de daño cerebral. Quiere decir que en términos de cinco minutos que han pasado solamente, en términos de un año se duplica la incidencia de daño cerebral en términos de una valoración de apgar de uno a tres en el primer minuto y a los cinco minutos. Cuando se considera en apgar de valoraciones de cuatro a seis, en el primer minuto cae en unos por[centajes] de alrededor de 2.8 po[r c]iento de daño cerebral y la evaluación a los cinco minutos refleja un 5.3 más o menos po[r c]iento, a los cinco minutos, pero extendido al año, queriéndose decir que en un tiempo tan limitado como son cinco minutos entre una evaluación y otra el pronóstico y las complicaciones —como resultado a complicaciones que tuvo durante ese período tan corto de tiempo— se duplican. Por eso es que es bien importante tener conocimiento de la valoración al minuto y a los cinco minutos, y en algunos centros a los diez minutos." T.E. de 8 de abril de 1981, págs. 38–40.

([11]) M. Burke–Strickland & N.B. Edwards, *Meconium Aspiration in the Newborn*, Minnesota Medicine J. 1031–1035 (1973); G. A. Gregory, C. A. Gooding, R. H. Phills & W. M. Tooley, *Meconium Aspiration in Infants—A Prospective Study*, 85 The Journal of Pediatrics 848–852 (dic. 1974); Hellman & Pritchard, *op. cit.*; John J. Bonica, *Obstetric Analgesic and Anesthesia.*

existencia de una pelvimetría, etc.; 3. aplicación errónea de fórceps; 4. evaluación impropia de la paciente y del estado crítico del feto, y 5. tratamiento inadecuado y poco agresivo al nacer la niña en las condiciones en que nació. *Exhibit 1*, págs. 25–26.

Igual conclusión se impone respecto al tratamiento brindado a la bebé Sylvia por el doctor Zeni. No cumplió con las exigencias requeridas por la práctica aceptada de la medicina. Veamos.

Los demandantes aducen que el doctor Zeni no le brindó el tratamiento requerido a la bebé y la abandonó. Por su parte, éste sostiene que el tratamiento de resurrección brindado fue el apropiado. Consistió únicamente en aplicar un laringoscopio, succionar las secreciones y poner el respirador de infantes a funcionar, el cual proveía oxígeno a los pulmones a través de una mascarita. *No la intubó.* El procedimiento duró menos de un minuto. Después dicho galeno estuvo observando su respiración, y alega que una vez la bebé fue entregada a un pediatra para ser trasladada al Salón de Infantes, se marchó. El tribunal de instancia rechazó su versión y acogió la tesis de los demandantes. Nos hacemos eco.

La niña había hecho meconio[12] mientras estaba en el vientre materno, detalle que dado a la posición que presentaba, constituyó una señal de complicación fetal.

Uno de los peritos sostuvo que debido a que la niña había hecho meconio, y en vista de la forma en que venía, eran anticipables estos riesgos:

---

[12] *Meconio* (*Meconium*): Material mucilágeno negroverdoso en los intestinos de un feto de término completo, que es una mezcla de las secreciones de las glándulas intestinales y fluido amniótico. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder*, Nueva York, Matthew Bender, 1986, Vol. 2, pág. M-53.

El bebé respira durante el tiempo que está en [el] útero y circula el líquido amniótico a través de sus pulmones. Esta es la forma en que mantiene elásticos los mismos para cuando comienza a respirar al nacer un bebé espontáneamente. Si ese líquido amniótico es cargado de meconio, por la razón que sea, el sufrimiento fetal que produce meconio que [d]onde va a caer obviamente es al líquido amniótico y sobre la superficie del cuerpo del bebé, específicamente un bebé que viene con la cabeza hacia arriba, sobre las áreas que más fácilmente puede respirar es prácticamente ineludible el presumir que un bebé de esta naturaleza y en la forma en que se describe su nacimiento envuelto en meconio espeso y con una descarga espesa y pegajosa tiene que haber en alguna forma aspirado meconio. . . .

La aspiración de meconio que va suspendido usualmente en el líquido amniótico, que también tiene vér[n]ix [c]aseosa y otros de vér[n]ix del feto, usualmente lo que causa es una pulmonía por aspiración. Y esa pulmonía por aspiración se puede manifestar y se manifiesta usualmente como una asfixia *neonatorum,* es una de las causas más comunes que se describe de asfixia *neonatorum.* También hay unos estudios que informa[n], y se han informado en la literatura, respecto al síndrome de aspiración de meconio que se ha señalado como que a[u]n en aquellos bebés en que la aspiración puede haber sido mínima, la mortalidad y morbilidad neonatal y perinatal suben grandemente en estos casos. T.E. de 7 de abril de 1981, págs. 151–153.

■ Más adelante expone:

El síndrome de aspiración de meconio se ha informado en un 1.9% de infantes con manchas de meconio en el líquido amniótico con una mortalidad tan alta como el 28%. Por tanto, es imperativo que el manejo de los infantes con aspiración de meconio sea impecable. El fín [*sic*] de resucitación debe ser notificado en cualquier momento en que líquido amniótico con manchas de meconio esté presente al momento del nacimiento. Desde el estudio de Carson se sugiere que los servicios pediátricos y obstétricos en conjunto deben manejar el síndrome en el cual hay meconio en el líquido amniótico. En su estudio la succión nasofaríngea intraparto fue utilizada

para reducir la incidencia del síndrome de aspiración de meconio desde el 1.9% hasta 0.4%, y para reducir la mortalidad a cero. Tan pronto como la cabeza del infante aparece en el periné y antes de que los hombros sean ... nazcan, el obstetra debe pasar un cat[é]ter de succión DeLee a través de las ventanillas de la nariz del infante al nivel de la nasofaringe y aspirar cualquier meconio o mucosidad. La boca y la hipofaringe deben ser succionadas. Siguiendo este proceso el pediatra debe intubar cualquier infante que tenga meconio en el cordón. Si la nasofaringe no es aspirada antes del nacimiento del cuerpo del bebé el "recoil", o sea, "elastic recoil", el efecto de rebote elástico del pecho que se le inicia con el primer esfuerzo respiratorio permite la aspiración de meconio dentro del árbol traqueobronquial. En esta situación la tráquea debe ser intubada y el meconio debe ser aspirado hasta que el árbol traqueobronquial esté completamente libre de secreciones. Fisioterapia del pecho dada cada hora se indica de ahí en adelante hasta que el meconio ya no se note en las secreciones ... si en adición el infante tiene asfixia y el manejo previamente descrito para asfixia debe seguir la succión de faringe y/o tráquea. En cualquier caso el infante debe ser cuidadosamente observado por las próximas horas. Una placa de pecho confirmaría el diagnóstico del síndrome de aspiración de meconio, eliminando la posibilidad de neumotórax o neumomediastinu[m q]ue, sin embargo, deben sospecharse a[u]n ... en cualquier caso en que la condición del infante se deteriore. El aspecto más difícil de tratamiento de esta enfermedad es la persistencia de la hipertensión pulmonar que puede llevar a hipoxia severa. El uso de hidrocloruro de Tolazoline ha sido de mucha ayuda en el manejo de pacientes con vasoconstricción pulmonar[.]" Y ahí finaliza esa sección. T.E. de 7 de abril de 1981, págs. 182–184.

Existe controversia sobre cuándo el doctor Zeni arribó a la Sala de Partos para atender la llamada de emergencia. Éste aduce que según el propio testimonio de la señora Riley, llegó a las 4:37 P.M. Por otro lado, ella sostiene que dada su condición en ese momento le era muy difícil precisar la hora exacta. Sostiene que el doctor Zeni fue quien le dio

el Índice Apgar de 6 a la niña y que esto ocurrió a los 15 minutos de haber nacido. Bajo esta premisa, ello debió haber ocurrido a las 4:27 P.M.

Conocemos que a las 4:12 P.M. nació y que a las 4:45 P.M. fue admitida al Salón de Infantes. Entre ambos momentos transcurrieron 33 minutos. En este período nació Sylvia, y ocurrió la emergencia. Ante la pobre condición de la niña, la doctora Rodríguez de Pacheco y las enfermeras de Sala de Partos —previo tratamiento rutinario— le suministraron oxígeno; después, el doctor Zeni fue llamado; éste se personó rápidamente; en menos de un (1) minuto la resucitó, observó y poco después optó por retirarse. Aunque el foro de instancia guardó silencio al respecto, y las partes no lo mencionan en sus alegatos, evidentemente ocurrió un incidente en la Sala de Partos entre el doctor Zeni y el Sr. Cristino Pérez Febo, padre de la bebé Sylvia. Así surge del apartado undécimo (11) de la demanda enmendada y la contestación del doctor Zeni. El mismo fue motivado porque el señor Pérez Febo comenzó a tomarle fotos durante el tratamiento de resurrección. El doctor Zeni se opuso. Lo consideró una imprudencia y hubo una discusión. Desconocemos cuánto tiempo transcurrió y cómo ello pudo afectar la actitud del doctor Zeni. Sí sabemos que su tratamiento fue insuficiente e incompleto y la gravedad de la bebé requirió más ayuda. Según antes señalado, un pediatra respondió. Fue éste quien después la llevó al Salón de Infantes a las 4:45 P.M. Describió así su intervención:

Cuando la paciente nació ayer tarde, fui llamado por radio mientras me disponía a marcharme del hospital. Subí inmediatamente a la Sala de Partos y encontré la paciente en peligro respiratorio. Tenía retracciones, un ronquido. Estaba levemente cianótica y el personal de Sala aplicaba oxígeno y estimulaba al bebé. Tomé y llevé la paciente al Salón de Infantes para el manejo de un bebé agudamente enfermo,

y lo entregué al Dr. Rodríguez quien allí lo esperaba. (Traducción nuestra.)[13] Expediente médico, pág. 5.

En virtud de lo expuesto, es obvio que la bebé Sylvia sufrió otro ataque respiratorio después de haberla tratado el doctor Zeni. Ciertamente su versión de que permaneció en la Sala de Partos hasta que la bebé fue entregada a un pediatra y respiraba normalmente, choca y es incompatible con la prueba, en particular con la dificultad respiratoria que dicho pediatra describió y evaluó como "agudamente enferm[a]".

Según señalamos, la prueba y los testimonios periciales revelan que la niña comenzó a sufrir daño cerebral intrauterinamente, pero que la falta del tratamiento requerido al nacer y poco después dio lugar a que estos daños cerebrales se agravaran. En la cronología de eventos —aunque en menor grado— el doctor Zeni coadyuvó a incrementar los daños producto de la negligencia de la doctora Rodríguez de Pacheco. Su intervención fue muy breve y omitió entubarla. Se marchó demasiado rápido. "El abandono no es el tipo de negligencia indicativo de incompetencia o una fechoría, tales como dejar un instrumento dentro del paciente, o hacer un diagnóstico incorrecto o cuando se da una receta errónea o cuando ha ocurrido un desliz del escalpelo. Más bien, surge de la falta de diligencia, vigilancia y atención que puede ocurrir

---

[13] La nota en inglés decía:

"When [patient] was born yest[erday] afternoon, I was called on the radio while I was leaving the hospital. I went inmediately to the Delivery room [and] found that the [patient] was in resp[iratory] distress. Had retractions, had a grunt. P[atient] was [lightly] cyanotic and the [Labor room] personnel was given [*sic*] ox[ygen and] stimulation to the baby. I took [the patient] down to the Nursery for the management of an acutely ill baby[, and] gave the baby to Dr. Rodríguez who was waiting for the [patient] at the [N]ursery."

después de esos errores." (Traducción nuestra.) J. Mains, *Medical Abandonment*, Med. Trial Tech. Q. 307 (1985).

Los peritos de la demandante señora Riley demostraron que el tratamiento fue inadecuado. Además se ofreció evidencia documental en cuanto a cuál era la mejor práctica de la medicina en casos como el de Sylvia para 1973. Se hizo referencia al reputado artículo del Dr. John J. Bonica, expositivo de que en distintas categorías de depresión respiratoria siempre es necesario mantener las funciones vitales que acompañan la respiración, de manera que el cuerpo pueda responder mejor. Ello no se hizo en este caso. Las fotos presentadas en evidencia demuestran que la niña fue colocada sobre una mesa de acero inoxidable, completamente desnuda. Sobre ella aparece que estaban las enfermeras en un esfuerzo por retornarle la respiración. En el fondo de la foto se ve lo que aparentaba ser una cuna con una lámpara de calor radial sobre la misma. Esta era la mesa donde debía estar la niña. El ilustrado foro de instancia entendió que ello era evidencia incontrovertible de que —aun teniendo los instrumentos y medios— no se le aplicaron para mantener el calor en su diminuto cuerpo.

En cuanto a las actuaciones del doctor Zeni, el Dr. Juan J. Hernández Cibes dijo lo siguiente:

> No sabemos porque no hay una sola nota en ese expediente de ese médico, que es un médico que es vital en el tratamiento de esa niña, respecto a cuáles fueron los primeros pasos dados en el proceso de tratar la niña, excepción hecha de una nota que pone el pediatra en el r[é]cord de la niña y una contestación en un interrogatorio. Esa ausencia total de información directa del anestesiólogo, que pudo haber arrojado una luz enorme respecto al tratamiento futuro o al daño concebido a la niña en ese momento, mire, el mero hecho de no haberla puesto en el r[é]cord constituye una negligencia imperdonable. No estoy omitiendo minucia. Número dos: Resulta obvio que el anestesiólogo por no haber cumplido con lo primero que hemos señalado, tampoco ofreció el

tratamiento adecuado a esta niña. Y en este caso la razón pudo haber sido porque no cumplió con lo que señalamos o porque no lo sabía, pero fundamentalmente señala en un interrogatorio que su tratamiento es el aceptado por la medicina y que fue una succión de las nares, una succión del área de la laringofaríngea, de secreciones que de acuerdo con la nota del pediatra —que es la única información que tenemos— eran muy espesas y se describe un "respiratory grunt", que es lo que aparentemente satisface el hecho de que se había dado el tratamiento necesario, en adición a terminada la limpieza de áreas[,] aplicarle la mascarilla de presión positiva que según señaláramos ayer no se usa por unas razones que ya hemos explicado —y si usted quiere se las vuelvo a explicar— no tiene un mecanismo que pueda controlar la presión con que se insufla el pulmón del bebé y por lo tanto dos cosas ocurren: si hay meconio en tráquea y bronquios, en todo el árbol traqueo-bronquial —según se describió— no hubo oportunidad de que esto fuese succionado[,] por cuanto la presión que la mascarilla ejerce de presión positiva no es controlable. Tenía en sus manos la posibilidad de intubar esta niña, que es lo que se practica de acuerdo con las normas médicas en este caso aquí en este país donde estamos viviendo, y se practica desde entonces, desde 1974, y además lo que se recomienda y hemos leído previamente. No determina dos estados adicionales que señalamos ayer eran fundamentales y básicos en el tratamiento de una infante severamente asfixiada, como por ejemplo sacarle una muestrecita de sangre para PH a ver si la sangre estaba ácida o no, y hacerle una determinación de presión de gases arteriales en la sangre, específicamente oxígeno y bióxido de carbono y —mire— si alguien tiene que saber sobre eso es el anestesiólogo. No tan s[ó]lo en los bebés, en cualquier paciente, porque esa es una de las áreas que más importantes son en la conducción de la profesión de anestesia. Eso no se hizo, no hay evidencia alguna de que se haya hecho ni siquiera por la única evidencia que tenemos, que es la nota del pediatra. No podemos ni siquiera abonar como excusa.... T.E. de 8 de abril de 1981, págs. 39–42.

En definitiva, la siguiente determinación compendia correctamente su negligencia:

... El Dr. Zeni fu[e] llamado a la Sala de Partos para atender de emergencia a la niña Sylvia Pérez Riley, quien él mismo describió que estaba en depresión respiratoria, retrayendo y cianótica, por haber sufrido una anoxia cerebral intrauterina. Le aplicó un tratamiento s[u]mamente inadecuado el cual él mismo describe que duró menos de un minuto y consistió en limpiarle las secreciones a la niña y darle oxígeno a través de una mascarita [para]`infantes; que luego que la niña reaccionó favorablemente, la observó por un tiempo y se marchó.

De acuerdo a la[s] más altas exigencias de la medicina, esta niña debió haber sido entubada y se le debió haber administrado una terapia intensiva. Es obvio que el Dr. Celso Víctor Zeni fue crasamente negligente *al abandonar* a esta niña en el momento que más necesitaba el tratamiento adecuado. No puede haber excusa para esta negligencia. *Exhibit* 1, págs. 24–25.

No se adujo excusa válida para que el doctor Zeni siguiera una rutina tan parca. La omisión de no entubarla fue crucial. Conforme lo requiere la reglamentación del Departamento de Salud, en la Sala de Partos había el necesario "equipo para revivir al recién nacido y facilidades para administrar oxígeno". 24 R.&R.P.R. sec. 18-123(e). Las apreciaciones del tribunal de instancia tienen apoyo en la prueba. Como tal, deben "ser objeto de gran deferencia en ausencia de circunstancias extraordinarias o indicios de pasión, prejuicio o parcialidad o error manifiesto que muevan al Tribunal apelativo a intervenir, se impone un respeto a la aquilatación de credibilidad del foro primario". *Pérez Cruz* v. *Hosp. La Concepción*, supra; *Sanabria* v. *Sucn. González*, 82 D.P.R. 885 (1961).

Concluimos que la doctora Rodríguez de Pacheco y el doctor Zeni omitieron brindar a sus pacientes Sharon Riley y Sylvia Pérez Riley "[a]quella [atención] que, reconociendo los modernos medios de comunicación y de enseñanza, establece que el nivel o calidad de esa atención

debe ser la que llena las exigencias profesionales generalmente reconocidas por la profesión médica". *Oliveros* v. *Abréu*, 101 D.P.R. 209, 226 (1973); *Morales* v. *Hosp. Matilde Brenes*, 102 D.P.R. 188 (1974); *González* v. *E.L.A.*, 104 D.P.R. 55 (1975); *López* v. *Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197 (1978); *Negrón* v. *Municipio de San Juan*, 107 D.P.R. 375 (1978). Quedó también establecida la relación causal. No estamos ante una situación eximente de responsabilidad debido a un error en el juicio humano, de buena fe, o de un diagnóstico o tratamiento adecuados. *Oliveros* v. *Abréu*, supra, págs. 227-228; *Morales* v. *Hosp. Matilde Brenes*, supra, pág. 194; *Rosado Rosado* v. *E.L.A.*, 108 D.P.R. 789, 795-796 (1979). P.D. Rheingold & P.F. Davey, *Standards of Care in Medical Malpractice Cases*, Wetch, Legal Medicine Annual 279-301 (1974).

## IV

*Daños e Indemnización*

Según el foro de instancia, la niña Sylvia sufrió daños en el sistema nervioso causado por las convulsiones que perduraron por un término de tiempo. "La encefalopatía anóxica se debió a un insulto al cerebro de la niña causado por la falta de oxígeno. Este insulto anóxico donde los tejidos del cerebro no reciben suficiente oxígeno es como si fuera un golpe o una herida[, provocando] que haya una reacción de los tejidos con hinchazón, hiperemia, y hasta posible neurosis y pérdida o muerte de algunas de las células." *Exhibit* 1, pág. 28.

A los 4 meses de edad el neurólogo doctor Mirabal Font tuvo la impresión de que la niña tenía diplejía espástica,[14] resultante de un daño cerebral a las partes motrices del

---

[14] Espástica — el tono muscular está aumentado, los movimientos son torpes y rígidos.

cerebro, el cual ocasiona mayormente falta de coordinación en el uso de las piernas. La condición afecta las cuatro extremidades. Las piernas son más afectadas que los brazos. La dificultad estriba en el uso voluntario de las extremidades. La palabra "espástica" se refiere a que el tono muscular esta aumentado, y que los movimientos son torpes y rígidos. A los 8 meses determinó que el perímetro encefálico de la niña era de 41 centímetros el cual es menos de lo esperado para una criatura de 8 meses. La niña tenía además un agarre inmaduro del tipo *ulnar*, esto es la niña utilizaba la parte de la mano donde está el dedo pequeño. Sylvia babeaba excesivamente. El doctor Mirabal Font confirmó entonces su opinión inicial de diplejía espástica. La inteligencia de la niña era cerca de lo normal aunque mucho menor de la que debió haber sido.

Al respecto el tribunal expuso: . . ."[C]uando un bebé sostiene daño cerebral a los hemisferios cerebrales, la evidencia clínica de este daño no se hace aparente en el período de recién nacido sino que empieza a hacer[se] aparente lentamente según el niño se supone se desarrolle y no se desarrolla o se desarrolla lentamente. La razón de esto es que el recién nacido no tiene el uso de los circuitos hemisféricos al momento de nacer y empieza a usar estos circuitos poco a poco y lentamente según crece. Por lo tanto, hasta tanto no llegue el momento cuando el niño tenga acceso a esos circuitos, es que se puede percatar que éstos no están funcionando bien. Así se hace aparente y se confirma la sospecha de daño cerebral." *Exhibit* 1, pág. 29.

El daño cerebral sufrido por Sylvia fue en el área hemisférica, llamada área o corteza motriz. "En esta parte del cerebro están representadas todas las partes del cuerpo. Las piernas, los hombros, la cara, los brazos, las manos en diferentes partes de la corteza cerebral. Si el individuo va a mover la mano, el estímulo para mover la mano sale de la parte cortical lateral; si el individuo va a mover la pierna,

el estímulo se origina en la parte medial[,] cerca de la línea media." *Exhibit* 1, pág. 30. El daño del área motriz fue en la parte medial cerca de la línea media, adyacente al otro hemisferio. Por estar tan cerca frecuentemente se envuelven bilateralmente. El hemisferio izquierdo controla la pierna derecha y el hemisferio derecho controla la pierna izquierda. Debido a esta contigüidad, frecuentemente en los niños dipléjicos el defecto es bilateral y envuelve ambas piernas. Por consiguiente Sylvia tiene dificultades en el uso de las extremidades superiores aunque menor que la que tiene con sus extremidades inferiores. El daño es asimétrico, esto es, ella usa mejor el brazo y la mano izquierda.

A los 14 meses de edad el doctor Mirabal Font encontró que el perímetro cefálico de la niña era de 43 centímetros. Esta medida es bastante menos del promedio. Tenía la cabeza pequeña para su edad. Sylvia podía seguir instrucciones verbales, sentarse por un tiempo corto pues se caía. Tenía mucha espasticidad de las extremidades y pobre coordinación. Más pobre en las piernas que en los brazos.[15]

A los 3 años 9 meses, el 17 de mayo de 1978, el doctor Mirabal Font determinó que el perímetro cefálico de Sylvia era de 18 pulgadas, este es el perímetro normal para un niño de 1 año de edad. Su caminar era torpe y tenía que sostenerse de un mueble a otro. Las extremidades inferiores demostraban espasticidad marcada especialmente en los abductores[16] y también de los tendones de Aquiles.[17] Al caminar tendía a desviar los pies hacia adentro. Le fueron presentados figuras de animales y objetos los cuales no pudo

---

[15] En esta visita es que Sharon Riley se entera por el doctor Mirabal Font que la niña tenía un daño cerebral permanente. Este galeno lo informó en ese momento. Siguió su mejor criterio médico de dar este tipo de noticias sólo cuando se está profesionalmente seguro.

[16] Los músculos abductores son los que mantienen las piernas juntas.

[17] Los tendones de aquiles son los que están en la parte de atrás de los tobillos.

identificar. Aunque entendía el lenguaje, no podía expresarse.

El tribunal determinó que Sylvia "siempre tendrá dificultad en el uso de sus piernas y que su caminar siempre será torpe y con dificultad. Tendrá dificultad en subir y bajar escaleras; tendrá dificultad en la práctica de los deportes, hasta el punto de que eso será imposible para ella, ni bailar.... [L]a niña ... no tiene el potencial intelectual que tenía cuando ella se concibió, lo cual la hace no candidata para llegar a la Universidad, aunque podría graduarse de una escuela vocacional para impedidos. Que de no haber sufrido estos daños, su inteligencia hubiera sido superior". *Exhibit* 1, págs. 32–33.

En enero de 1980 la niña Sylvia fue sometida una operación correctiva. Como consecuencia permaneció con ambas piernas enyesadas por seis (6) semanas.

El tribunal de instancia concluyó que Sylvia "sufrió un daño cerebral permanente que le ha imposibilitado de por vida, causándole unas limitaciones extraordinarias, las cuales le imposibilitan llevar a cabo una vida normal durante el resto de su vida, con el agravante de que su capacidad intelectual aunque raya en lo normal bajo, la hace consciente de su impedimento, causándole graves sufrimientos e inestabilidad emocional.... [Por lo que] necesitará cuido y asistencia de otras personas para toda su vida".([18]) *Exhibit* 1, pág. 33.

---

([18]) Una evaluación de su capacidad intelectual al 2 de mayo de 1979 arrojó los siguientes resultados:

"Sylvia estableció una edad basal a los tres años y medio, continuó obteniendo logros esporádicos en las edades subsiguientes hasta fallar consistentemente a nivel de siete años. *Estos resultados la sitúan dentro de los límites de inteligencia normal promedio al compararla con niños de su misma edad cronológica.*

"El análisis de la prueba reflejó que *la niña posee una capacidad para el pensamiento abstracto y desarrollo de conceptos superior a su edad.* Ello implica que su lenguaje interno mantiene un desarrollo adecuado aunque exista una dificultad en el nivel expresivo secundaria a su condición.

Respecto a los daños de la señora Riley, ella se vió privada de lactar y tener en sus brazos a su hija durante los primeros diez (10) días de nacida. Sabía que había convulsado. Además, una hermana de la caridad le informó que la niña estaba muy delicada y había sido bautizada de emergencia. La señora Riley regresó a su casa sin ella. La niña quedó hospitalizada por un período de once (11) días adicionales. Esto le generó gran preocupación. Posteriormente, cuando la niña contaba con tres (3) meses, la vio sufrir dolores de cólicos y llantos. Como madre se desesperaba al no poderla aliviar. A los cuatro (4) meses aproximadamente, aumentó su preocupación al percatarse de que la niña no podía mover bien su mano derecha y de que las piernitas estaban muy rígidas. Todavía desconocía las razones de esta condición. Aunque la niña fue sometida a terapia la señora Riley sufrió una decepción. Su preocupación se agravó aún más al notar que la niña no respondía favorablemente al tratamiento. Finalmente, se enteró de la condición irreversible debido a un daño permanente del cerebro sufrido durante el parto. Ello ocurrió cuando la niña contaba catorce (14) meses de edad.

Como resultado de este penoso drama materno-filial, la señora Riley se vió obligada a abandonar su carrera de actriz. Ello le produjo depresión. Ciertamente tuvo y tendrá que continuar dedicándole casi todo su tiempo al cuidado especial de una niña parcialmente impedida. Se vió obligada a solicitar públicamente ayuda económica de sus compañeros y de la ciudadanía en general con miras a trasladarse

---

"Otras áreas evaluadas respondían a su habilidad para discriminar detalles, diferencias y similaridades a nivel visual. *Aquí funcionó a niveles promedio.*

*"Su área de mayor dificultad responde a su habilidad y desarrollo en coordinación motora. Ello se explica por su condición física.*

"En general Sylvia se presenta como una niña de una capacidad intelectual adecuada con problemas específicos de coordinación motora. *En base a estos resultados la niña debe ser ubicada en grupos de niños a la par con su edad cronológica.*" (Énfasis suplido.)

al Instituto para el Desarrollo del Potencial Humano en la ciudad de Filadelfia, Estados Unidos.(19)

██ Las necesidades de tratamiento intensivo de fisioterapia y organización neurológica, para mejorar el daño sufrido, le obligaron a rechazar ciertas ofertas atractivas de trabajos teatrales, televisión y cine. Si bien el tribunal a quo determinó que las mismas le hubieran producido ingresos por la cantidad de $30,000, no creemos que la prueba apoye totalmente esa conclusión. Ésta sólo consistió del testimonio de algunos miembros de la farándula puertorriqueña y productores, quienes atestiguaron que la señora Riley no pudo aceptar varias ofertas, y tuvo pérdida de ingresos por más de $30,000. Sin embargo, no hay evidencia sobre el historial de ingresos anteriores. La señora Riley no testificó sobre ninguno de los trabajos ofrecidos por los productores, excepto en el caso del Sr. Marito Fernández. Creemos que la prueba sólo sostiene razonablemente la suma de $15,000.

Como resultado de su precaria situación económica, la señora Riley se mudó a casa de su hermana. Se sintió apesadumbrada por depender ella y su hija para el sustento. No intervendremos con la compensación de $100,000 fijada a la señora Riley en concepto de angustias mentales.

---

(19) Según la prueba ofrecida, los gastos médicos para el tratamiento de su niña ascendieron a $8,352.90. La propia madre le brindó el tratamiento de terapia respiratoria (*respiratory patterning*) durante seis (6) horas diarias por aproximadamente tres (3) meses. Esta partida debe permanecer inalterada.

Este tratamiento fue descrito de la siguiente forma: la niña se acostaba abrazada a un chaleco del cual provenían unas correas de lona, de donde iban adheridas unas agarraderas de madera cruzadas. Al estirarse éstas se comprimía la caja toráxica de la niña para ejercitar sus pulmones. Había que realizarlo a un ritmo específico con un medidor de tiempo y entre dos (2) personas. Las ocasiones en que la señora Riley no conseguía otra persona que le ayudara le causaba mayor ansiedad.

En cuanto a la cuantía de las indemnizaciones de la niña Sylvia, a la luz de la prueba desfilada, entendemos que las sumas de $500,000 por concepto de daños físicos, más $300,000 por daños mentales son exageradas. *Rodríguez Cancel* v. *A.E.E.*, 116 D.P.R. 443 (1985). Varios factores influyen en esta conclusión. Primero, tenemos presente que por su corta edad, durante los primeros meses de su infancia, la niña Sylvia no podía, como tal, sufrir daños mentales dentro del significado jurídico-compensatorio. *Correa* v. *Autoridad Fuentes Fluviales*, 83 D.P.R. 144, 160 (1961). Segundo, al adjudicar daños estamos conscientes que el dolor humano (físico y espiritual) no es similar ni pecuniariamente cotizable. El dinero y el dolor "son bienes de tan distinta categoría que no cabe comparación. Pero si el dinero no es suficiente para reparar este tipo de daños, es preferible que la víctima reciba una indemnización insuficiente a que no reciba ninguna. Por tanto, aunque el dinero no pueda ser parangonado con el dolor es posible proporcionar a la víctima una compensación que, sin llegar a devolverle lo perdido, le permita procurarse placeres y satisfacciones, psíquicas o mentales, aptas para atenuar el dolor sufrido". Ataz López, *op. cit.*, pág. 328. Tercero, llevados a sus extremos reales, los sufrimientos mentales y físicos son cuantificables al infinito. Sin unos límites razonables, la indemnización dejaría de tener la característica de resarcimiento para convertirse en una punitiva. *Rivera* v. *Rossi*, 64 D.P.R. 718 (1945). Valga aclarar que esta "interpretación no debe tomarse como menosprecio a la realidad y honestidad de [los] sufrimientos". *Pérez Cruz* v. *Hosp. La Concepción*, supra, pág. 739. Cuarto, al evaluar casos de mala práctica profesional médica,[20] salvo aquellos basados en hechos intencionalmente culposos o dolosos,

---

[20] "Si analizamos el [término médico] siguiendo a Abeille podemos decir que en el dominio linguístico indo-europeo la raíz *med* tiene el sentido de 'pensar',

recordamos "que la mano que cura no alcanza el grado de agravio social de la mano que hiere". *Negrón* v. *Municipio de San Juan*, supra, pág. 381, opinión disidente del Juez Asociado, Señor Díaz Cruz. Quinto, la estimación en daños y perjuicios es tarea intrínsecamente compleja. *Polanco* v. *Tribunal Superior*, 118 D.P.R. 350 (1987). "[L]a determinación de una compensación justa y razonable por los daños sufridos [es] tarea que constituirá un reto aun para un Salomón del siglo XX." *Emotional Disability and Compensation, Traumatic Medicine & Surgery for the Attorney*, Washington, Ed. Butterworth, 1962, Vol. 6, pág. 82. La apreciación humana valorativa de elementos que no son ostensibles y visibles sino intangibles (emociones tales como dolor, alegría, tristeza, frustración, paz, tranquilidad del espíritu, honor y otras) no está exenta de cierto grado de especulación. Aspiramos a que toda adjudicación sea razonablemente balanceada, esto es, ni extremadamente baja como tampoco desproporcionalmente alta. *Urrutia* v. *A.A.A.*, 103 D.P.R. 643, 647–648 (1975). Y por último, hemos de evitar, en lo posible, que el resarcimiento de daños y perjuicios se convierta en una industria lucrativa forense en que los médicos y pacientes sean la materia prima.([21])

---

'reflexionar', la cual encierra a veces valores técnicos: 'mensurar', 'pensar', 'cuidar un enfermo', 'gobernar'. De ahí 'medear', prodigar sus cuidados.

"Desde el origen 'medear' aparece en la lengua médica con el sentido de llevar, traer remedio. De donde proviene 'medens', médico, reemplazado en la época clásica por 'médicus' con todos sus derivados: 'medicina', 'medicinalis', 'médico', 'medicar', 'medicamentum'.

"*En suma, que el término 'medicus' encierra y expresa el sentido de meditación y acción curativa como finalidad; es decir involucra el concepto hermoso de una hermosa y abnegada profesión.*

"Pero es indudable que esa misma interrelación *médico-paciente, médico-sociedad*, genera *obligaciones, deberes, responsabilidad*." (Énfasis suplido.) Yungano, López Bolado, Poggi, Bruno, *Responsabilidad Profesional·de los Médicos*, Buenos Aires, Ed. Universidad, 1982, págs. 297–298.

([21]) El fenómeno de la masificación —y paradójicamente especialización de la medicina— se describe así:

En consideración de todos los factores envueltos, estimamos razonable la suma de $400,000 para Sylvia en concepto de daños físicos y mentales.

## V

*Otros planteamientos*

La demandada Dra. Edith Rodríguez de Pacheco sostiene que no es posible que ella y el doctor Zeni puedan ser cocausantes del daño de la menor Sylvia, por cuanto dichos actos u omisiones no son coetáneos sino consecutivos. El argumento no es correcto. Una cosa es que debido a la naturaleza de los daños, éstos no sean susceptibles de atribuírseles a un acto específico, y otra, que se reconozca la solidaridad de ambos por razón de los múltiples actos, omisiones y eventos que se combinaron para causarlos. Véanse: *Sánchez Rodríguez* v. *López Jiménez*, 118 D.P.R. 701 (1987); *Ginés Meléndez* v. *Autoridad de*

---

"Los médicos (de medicina interna y general, cirujanos, anestesiólogos, radiólogos, analistas, transfusores, odontólogos, rehabilitadores, etc.) trabajan hoy, casi todos, en condiciones no bien definidas, mejor diríamos escasamente definidas para el profesional mismo y para el paciente, y la llamada «socialización de la medicina» en que estamos entrando viene a cambiar profundamente las bases de la cuestión. Dice LAÍN ENTRALGO que «Varias hondas razones históricas han determinado el fuerte y progresivo *sesgo social de la medicina* de nuestro siglo». Indica cuatro razones y de ellas importa destacar la tercera: «El inexorable advenimiento de una sociedad 'de masas'. Por grandes que sean —dice— el talento clínico y la pulcritud moral del médico, la complejidad de las técnicas diagnósticas y terapéuticas y (la) enorme acumulación humana en las grandes ciudades exigen dar al tratamiento médico una estructura 'social'. El antiguo 'médico de cabecera' o de 'familia' apenas puede subsistir». Más adelante afirma que la creciente socialización de la medicina «ha dado figura a toda una serie de fenómenos médico-sociales» y entre éstos menciona «el cambio de la relación entre el médico y el paciente», afirmando que «puesto que esa relación no asienta primariamente sobre una 'confianza' íntima y personal, la ayuda médica se convierte en un servicio contratado, en el cual las dos partes suelen buscar ante todo su particular ventaja. La frecuencia de los procesos civiles contra los médicos —termino la cita— es un buen indicio de la mudanza operada»." (Escolio omitido.) L. Prieto-Castro y Ferrándiz, *Responsabilidad Médica. Proceso Médico*, 1975 Rev. Der. Procesal Iberoamericana, 707, 711-712 (1975).

*Acueductos*, 86 D.P.R. 518, 524 (1962); *Torres* v. *A.M.A.*, 91 D.P.R. 714, 717 (1965); *Rodríguez Sosa* v. *Cervecería India*, 106 D.P.R. 479, 483 (1977). Reafirmamos que en acciones de este género procede responsabilizarse a los médicos si la preponderancia de la prueba establece que las conductas negligentes combinadas fueron las que con mayor probabilidad causaron y agravaron el daño. *Cruz* v. *Centro Médico de P.R.*, 113 D.P.R. 719, 744-745 (1983); *Pérez Cruz* v. *Hosp. La Concepción*, supra.

▬ No erró el foro de instancia al merecerle credibilidad el testimonio del doctor Hernández Cibes. Su declaración estuvo respaldada por la reputada obra de Hellman y Pritchard, *op. cit.*, y otros artículos. El grado de interés pecuniario como perito que tuviera en el desenlace, por reprobable que sea ante los ojos de algunos, per se no lo descalifica ni le resta valor probatorio a su opinión pericial.[22]

▬ Tampoco incidió el tribunal al negarse a conceder un nuevo juicio a solicitud de la doctora Rodríguez de Pacheco para ofrecer una carta en que la Sra. Sharon Riley agradece a las maestras de su hija los esfuerzos conducentes a la mejoría de la niña durante su estadía en una escuelita privada.

La Regla 48.1 de Procedimiento Civil gobierna la situación. Dispone:

> Se podrá ordenar la celebración de un nuevo juicio por cualquiera de los siguientes motivos:
>
> (a) Cuando se descubriere evidencia *esencial* la cual, a pesar de una diligencia razonable, no pudo descubrirse ni

---

[22] Los testimonios de los doctores Fernández Plá y Edith Rodríguez de Pacheco *no* fueron sometidos en revisión. En la solicitud de transcripción sólo se nos pidió autorización para los testimonios de los doctores Hernández Cibes, Vélez Estrada, Mirabal Font, Jiménez Vélez y Zeni.

presentarse en el juicio. (Énfasis suplido.) 32 L.P.R.A. Ap. III, R. 48.1.

La evidencia obtenida *no* cumple con estos requisitos. Su admisión no goza del atributo de esencialidad. Tampoco cambiaría el resultado del pleito. Además, dicha evidencia pudo haber sido encontrada de haberse ejercido debida diligencia. Por último, las partes acordaron que cuando los demandados lo solicitaran, podrían examinar a la niña. No lo hicieron. ¿De qué se quejan?

◼ La concesión de un nuevo juicio descansa en la sana discreción del juez de instancia. *Ruiz Pérez* v. *Tribunal Superior*, 94 D.P.R. 416 (1967); *Carrión* v. *Sampedro*, 74 D.P.R. 413 (1953); Cuevas Segarra (P.P.P. II), *Procedimiento Civil*, págs. 328–329. Hemos de respetarla.

◼ En cuanto al obstetra Dr. Stanley Ascencio, se aduce que los demandados fueron privados del derecho que provee la Regla 52 de Evidencia, 32 L.P.R.A. Ap. IV, de llamarlo a declarar durante el juicio por su carácter de perito judicial. Tampoco les asiste la razón. Las partes habían acordado que el tribunal lo utilizaría como perito obstetra con el propósito de que le explicara los términos y la evidencia presentada, y así aligerar los procedimientos.(23) En casos de materia técnica, el uso de un perito judicial en la consecución del ideal de la verdad, es objetivo legítimo. Aquí no infringió ningún derecho.

---

(23) Al respecto, es revelador el siguiente diálogo:
"LIC. ALVARADO TIZOL:

"Sí, pero Su Señoría en ese artículo hay ... volvemos otra vez a la misma problemática de este caso, *hay un montón de palabras, etcétera, que yo creo que su Señoría debe tener el beneficio de que un facultativo se las explique porque son términos médicos sumamente técnicos que quizás puedan confundir al Tribunal y por eso es que traemos esos artículos para que el facultativo a la misma vez que los lee[,] pues los expli[que]*.

Por último, creemos que la partida de honorarios de abogado debe ser reducida a la suma razonable de $30,000.

 Otra vez más, a modo de epílogo exponemos que:

...bajo las normas jurisprudenciales de evaluación de prueba, tenemos el convencimiento jurídico y la certeza moral de que se demostró satisfactoriamente que las conductas negligentes de los demandados fueron los factores que con mayor probabilidad causaron el daño.

El juez, "[h]a de propender hacia la *certeza moral*, excluyendo toda duda que razonablemente pudiera albergarse; para su logro son cualidades indispensables un estricto sentido de moralidad personal y una intensa cultura jurídica. De ahí que deba saturarse en la convicción de la necesidad de formar una *conciencia moral* adecuada, marco que dignifique y aureole su vida profesional;.... Es la conciencia —escribe Peinador— la norma de la moralidad subjetiva, y, sin ella, la norma objetiva, que lo es la ley divina y humana, resulta prácticamente inoperante; una conciencia bien formada es la mejor garantía de una moralidad en todo conforme con los preceptos a que tiene que ajustarse la actividad del hombre, la general o la profesional.... Siempre

---

"LIC. MIRANDA CARDENAS:

"Perdóneme el Tribunal, si ese es el propósito entonces nosotros también nos vamos a hacer eco de la objeción por el siguiente fundamento: *Si recordamos el comienzo de este caso, ya mucho antes de comenzar el procedimiento, se acordó que Su Señoría podía designar —y así designó— un facultativo consultor para esa materia.* Y ese *precisamente es el propósito del consultor,* así es que me parece señor Juez que estaríamos derrotando el compromiso que hicimos con el Tribunal, si eso es lo único que pretende el compañero." *Ante esa orientación el tribunal expresó que iba a "consultar con el perito designado".* T.E. de 8 de abril de 1981, págs. 171–172.

Y más adelante:

"LIC. MIRANDA CARDENAS:

"No, pero yo estoy seguro que Su Señoría tiene una gran ventaja posiblemente sobre nosotros, Su Señoría tiene un *asesor obstetra* y además Su Señoría debe recordar que también *todos los abogados convinimos que le dábamos mano libre* a Su Señoría también para que *consultara también el anestesiólogo que Su Señoría designe.* Creo que *eso fue parte de nuestro compromiso.*" (Énfasis suplido.) Íd., pág. 177.

sabrá prestar oídos, en última instancia, a la voz de la conciencia, verdadera pauta de moralidad difícilmente falible cuando la inteligencia está ilustrada por la ciencia y la voluntad disciplinada por la moral. Todos sabemos de las constantes y moduladas inflexiones de esta voz insobornable, fértil consejera, desinteresada amiga, a veces suavemente tranquilizadora, en otras insistentemente admonitiva". (Escolios omitidos.) F. Soto Nieto, *op. cit.*, pág. 22. *Núñez* v. *Cintrón*, 115 D.P.R. 598, 619–620 (1984).

Según expuesto, *se dictará sentencia que modifique la del Tribunal Superior, Sala de San Juan. Así modificada será confirmada.*

La Juez Asociada Señora Naveira de Rodón emitió voto particular. El Juez Presidente Señor Pons Núñez se inhibió. El Juez Asociado Señor Rebollo López no intervino.

—O—

Voto particular de la Juez Asociada Señora Naveira de Rodón.

Estamos conformes con las Partes I, II y III de la opinión de la mayoría. Con respecto a la Parte IV estamos conformes en cuanto algunos aspectos y disentimos en cuanto a otros. Disentimos en tanto y en cuanto la mayoría rebaja las cuantías otorgadas a la niña codemandante Sylvia Pérez Riley. Las razones aducidas por la mayoría no nos convencen. Somos de la opinión que el tribunal de instancia valoró de forma justa y adecuada los daños físicos y mentales de la niña.

En cuanto a la Parte V disentimos de aquélla donde se rebaja la cuantía concedida en concepto de honorarios. Concurrimos con el resto. Sin embargo, debido al impacto y la importancia que sobre la práctica grupal o conjunta de la medicina tiene la doctrina de la solidaridad, en su modalidad de plural contribución culposa sin concierto

previo en la realización de hechos que generan un daño único, quisiéramos hacer ciertas observaciones.

Tomamos conocimiento de que en nuestra sociedad moderna los avances de la ciencia y la técnica han producido el fenómeno de la especialización y subespecialización profesional, que torna el acto médico de uno individual en uno que se caracteriza por la actividad conjunta, coetánea o sucesiva, de varios profesionales de la salud. La práctica grupal o conjunta de la medicina es hoy la norma, no la excepción. La colaboración entre estos profesionales expertos en sus respectivos campos hay que alentarla y fomentarla. El beneficio de esta labor de equipo lo deriva de inmediato el paciente y, a la larga, la sociedad en general.[1]

Estamos de acuerdo con la mayoría en que cuando por la naturaleza del daño éste no es susceptible de atribuírsele a un acto específico de una o varias personas, procede responsabilizar a todos los que concurrieron en producirlo, "si la preponderancia de la prueba establece que las conductas negligentes combinadas fueron las que con mayor probabilidad causaron y agravaron el daño". Opinión del Tribunal, pág. 807.

Nuestro derecho sobre responsabilidad extracontractual está apuntalado en el principio de imputabilidad individual. Cada persona le responde al perjudicado por los daños que causen sus actos u omisiones culposas. A manera de excepción se responsabiliza por las actuaciones de otros.[2] También priva la teoría de la causalidad adecuada,

---

[1] Sobre la práctica grupal o conjunta de la medicina y la responsabilidad grupal o individual que ésta puede generar, véanse: J.O. Ramírez, *Indemnización de Daños y Perjuicios*, Buenos Aires, Ed. Hammurabi, 1985, T. 6, XXXI, Sec. 144(1), incisos (A), (R), (B) y (C); A.J. Bures, *Responsabilidad Civil de los Médicos*, Buenos Aires, Ed. Abaco de Rodolfo de Palma, Cap. VI.

[2] En esta categoría está la responsabilidad que impone el Art. 1803 del Código Civil, 31 L.P.R.A. sec. 5142:

"La obligación que impone la sección anterior es exigible, no sólo por los actos u omisiones propios, sino por los de aquellas personas de quienes se debe responder.

"conforme a la cual 'no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general'". *Soc. de Gananciales* v. *Jerónimo Corp.*, 103 D.P.R. 127, 134 (1974). Por lo tanto, y también a manera de excepción, cuando existe un vínculo de solidaridad, se le impone a una persona responsabilidad, frente al perjudicado, por las actuaciones de otra. Con estos principios en mente pasemos a considerar el problema de la solidaridad.

Como regla general, cuando varias personas concurren en la producción de hechos culposos, coetáneos o sucesivos, que generan un resultado dañoso e indivisible, éste deberá ser reparado solidariamente por los autores. Esto no significa, sin embargo, que automática e irremisiblemente, siempre que surja un daño único y concurran en la producción de los hechos que lo generaron varias personas, éstas sean solidariamente responsables frente a la víctima.

En relación con la solidaridad extracontractual y sus diferentes vertientes, nos señala De Cossío que la jurisprudencia española ha sido vacilante. Señala que:

...En un principio parece partir [la jurisprudencia española] de la base de una responsabilidad *in solidum*, es

"El padre y por muerte o incapacidad de éste, la madre, son responsables de los perjuicios causados por los hijos menores de edad que viven en su compañía.

"Los tutores lo son de los perjuicios causados por los menores o incapacitados que están bajo su autoridad y habitan en su compañía.

"Lo son igualmente los dueños o directores de un establecimiento o empresa respecto de los perjuicios causados por sus dependientes en el servicio de los ramos en que los tuvieran empleados, o con ocasión de sus funciones.

"El Estado es responsable en este concepto en las mismas circunstancias y condiciones en que sería responsable un ciudadano particular.

"Son, por último, responsables los maestros o directores de artes y oficios respecto a los perjuicios causados por sus alumnos o aprendices, mientras permanezcan bajo su custodia.

"La responsabilidad de que trata esta sección cesará cuando las personas en [ella] mencionadas prueben que emplearon toda la diligencia de un buen padre de familia para prevenir el daño."

decir, que admite la tesis clásica de que cada uno de los responsables debe responder de la totalidad del daño (SS. de 24 de febrero de 1928 y 13 de marzo de 1929). Sin embargo, el propio Tribunal, resolviendo un problema de concurrencia de culpas de 19 de febrero de 1959, entiende que la responsabilidad es mancomunada, para volver en la de 14 de febrero de 1964 nuevamente a la teoría de la solidaridad.[3] A. De Cossío, *Instituciones de Derecho Civil*, Madrid, Ed. Alianza, 1975, Vol. I, pág. 309.

Por su parte, Soto Nieto nos indica que en relación con la solidaridad extracontractual "[l]a cuestión más delicada se ofrece en el supuesto de una doble o plural contribución a la originación del daño, no mediando concierto o voluntad concordada entre los plurales responsables respecto al hecho originador. El efecto siniestral aparece como la resultante de una pluralidad de ilícitos coetáneos o sucesivos, concurrentes todos con eficacia causal". F. Soto Nieto, *La responsabilidad civil derivada del ilícito culposo*, Madrid, Ed. Montecorvo, 1982, Cap. III, Sec. II(B), pág. 87. Expresa que con relación a la responsabilidad solidaria lo "esencial es que pueda detectarse semejante nexo de causalidad, que la damnificación originada pueda reprocharse moralmente a los varios autores". (Énfasis suprimido.) Íd., pág. 87. La solidaridad compartida emana necesariamente "[a]nte la

---

[3] También nos señala De Cossío que "[e]n realidad, se trata de una responsabilidad *in solidum*, sin perjuicio de la facultad que al Juez se reconoce de moderar la de cada uno de los responsables" a tenor con lo dispuesto en el Art. 1.104 del Código Civil español. A. De Cossío, *Instituciones de Derecho Civil*, Madrid, Ed. Alianza, 1975, Vol. I, pág. 309. Nuestro Art. 1057 del Código Civil, 31 L.P.R.A. sec. 3021, corresponde al Art. 1.104 del Código Civil español, y versa sobre la gradación de la culpa. Estos artículos son aplicables tanto a la obligación contractual como a la extracontractual. El Art. 1057 al igual que el español dispone:

"La culpa o negligencia del deudor consiste en la omisión de aquella diligencia que exija la naturaleza de la obligación y corresponda a las circunstancias de las personas, del tiempo y del lugar.

"Cuando la obligación no exprese la diligencia que ha de prestarse en su cumplimiento, se exigirá la que correspondería a un buen padre de familia."

repetición de accidentes y *la imposibilidad de determinar el origen exacto de los resultados,* la respuesta común y solidaria es medio eficaz para facilitar la acción del lesionado". (Énfasis suplido y escolio omitido.) Íd., pág. 88. Aclara Soto Nieto que esta responsabilidad conjunta es consecuencia "de la plural y coincidente causalidad, [y de que no haya] sectores del daño atribuibles pro parte". Soto Nieto, *op. cit.,* pág. 88. Señala que *"[c]uando pueda detectarse la porción de daño atribuible a cada acción, el acreedor perjudicado debe dividir su acción proporcionalmente a la responsabilidad de cada coautor".* (Énfasis del original.) Íd., pág. 90. Bajo estas circunstancias, cada partícipe "tendrá acotada, sin conexiones de solidaridad, la porción del *damnum* cuyo atendimiento le viene asignado". Íd., pág. 90.

En igual sentido se expresa Jaime Santos Briz cuando comenta:

> ...En el supuesto de autor individual, el Artículo 1.902 [Art. 1802 del Código Civil de Puerto Rico] establece su responsabilidad concreta; cuando los autores son varios, la regla no puede ser distinta: es decir, a cada uno se aplicará el Artículo 1.902, y de ahí que todos sean responsables. Surge después el problema de cómo ordenar esa responsabilidad conjunta, y se llega a la conclusión de que la única solución lógica, es establecer la responsabilidad solidaria de todos ellos, salvo si según las circunstancias puede delimitarse el daño causado por cada uno, en cuyo caso ya no estamos ante un caso de responsabilidad conjunta, que se da sólo cuando hubo daño con participación de varios, sin delimitarse ni ser posible la *delimitación de la intervención individual de cada uno.* J. Santos Briz, *Derecho de Daños,* Madrid, Ed. Rev. Der. Privado, 1963, Cap. VIII(II)(B)(2), pág. 292.

El comentarista argentino Isidoro Goldenberg enfoca el problema de la siguiente forma:

> ... La procedencia del resarcimiento en los casos de daños provocados por grupos, cuando falta la identificación del

autor del desmedro, conduce necesariamente a un conflicto valorativo que conmueve la base misma del sistema de responsabilidad civil.

"En efecto, por un lado está en juego el principio de la imputabilidad individual, que rechaza la imposición a un individuo del deber de reparar un mal que no ha causado; desde el ángulo del derecho de la víctima la proposición se invierte: ¿el daño injusto inferido por la acción de un grupo, debe ser soportado exclusivamente por aquélla?

"*Pertenece a la esencia de esta clase de responsabilidad la no individualización del autor material del daño*, por lo cual, idenficado éste, los demás integrantes del grupo quedan exonerados de toda obligación. También cabe a cada uno de los partícipes demostrar que no ha podido causar el hecho lesivo de conformidad con las circunstancias del caso en particular." (Énfasis suplido y escolios omitidos.) I.H. Goldenberg, *La relación de causalidad en la responsabilidad civil*, Buenos Aires, Ed. Astrea, 1984, Cap. VI, Sec. 37(b), págs. 152–153.

De todo lo antes expuesto, se puede colegir que en casos sobre impericia médica como el de autos, donde dos o más médicos concurren en la producción de hechos culposos sucesivos, sin que haya mediado concierto o voluntad concordada, y producen o agravan un daño único, éstos responderán de forma solidaria frente al perjudicado a menos que puedan delimitar o individualizar el daño causado por cada uno; en cuyo caso dejará de existir la solidaridad y responderán sólo por aquella porción del daño que hayan causado. En el caso de autos ni la Dra. Edith Rodríguez de Pacheco ni el Dr. Celso Víctor Zeni delimitaron o individualizaron el daño; por lo que, frente a la niña Sylvia Pérez Riley y a su madre Sharon Riley, responden solidariamente por la totalidad del daño causado.