Aponte Hernández, Juez Ponente
*1042 TEXTO COMPLETO DE LA SENTENCIA
La apelante, American Express Travel Related Services Company, Inc. (AMEX), solicita que revoquemos la Sentencia emitida el 14 de agosto de 2006 por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI). Mediante la misma, dicho foro le impuso a AMEX pagar al apelado, señor Roberto Rigau Llorens, $50,000 de indemnización de daños, $12,600 de daños especiales y $10,000 de honorarios de abogado. Además, le impuso el pago de $5,000 de honorarios de abogado a favor de Cabrera Car Rental, Inc.
Por los fundamentos que se exponen a continuación, se modifica la sentencia para eliminar la partida de $12,600 de daños especiales; y así modificada, se confirma.
I
El 5 de febrero de 2001, el Sr. Rigau acudió a Cabrera Car Rental, Inc., (Cabrera Car) para arrendar un automóvil. Escogió un Jeep, modelo Cherokee, y utilizó su tarjeta AMEX “Gold” para pagar el depósito de $500 por el arrendamiento. Incluyó al señor Wray Wilson Oliver como chofer autorizado del vehículo, por lo que pagó una cantidad adicional. Los espacios del contrato reservados para la cantidad final a pagarse quedaron en blanco, ya que se desconocía la fecha cierta en que el vehículo sería devuelto. El Sr. Rigau declinó el seguro para accidentes que le ofreció Cabrera Car.
El 16 de febrero de 2001, el automóvil arrendado se accidentó mientras lo manejaba el Sr. Wilson. Al día siguiente, el Sr. Rigau notificó a Cabrera Car sobre el accidente. Al ser notificado, Cabrera Car procedió a dar por terminado el arrendamiento, tomando la fecha de 17 de febrero de 2001 como fecha de entrega del vehículo. A base de dicho término, computó el monto del arrendamiento, el cual ascendió a $659.50. Luego llenó los espacios correspondientes en el contrato de alquiler para que reflejara la deuda final. En ese momento no hizo cargo alguno a la tarjeta AMEX del Sr. Rigau.
Posteriormente, el presidente de Cabrera Car, señor Kenneth Cabrera López, decidió no cobrar los $159.50 de diferencia entre el depósito pagado al momento del arrendamiento y los $659.50 computados al finalizar el mismo. Ello, a raíz de una llamada que le hizo la esposa del Sr. Wilson, señora María Teresa Robles Rivera, con quien tenía amistad.
*1043 Al condonar el balance de $159.50, Cabrera Car aceptó los $500 ya cargados a la tarjeta AMEX del Sr. Rigau como pago total de la deuda por el arrendamiento del automóvil. Sin embargo, dicha enmienda al acuerdo original no se reflejó en el contrato escrito de alquiler, el cual establecía que la deuda final era $659.50.
Luego de ello, Cabrera Car presentó una reclamación al seguro de alquiler que le ofrece AMEX a los poseedores de sus tarjetas como un privilegio. Dicho seguro se conoce como el “American Express Cardmember Car Rental Loss and Damage Insurance Plan. ”
Según señala la información ofrecida por AMEX, este seguro se activa automáticamente cuando el portador de la tarjeta cumple con las siguientes condiciones:

“1) Presents his or her eligible Card to the Rental Company to reserve the Rental Auto, by making a reservation; or by placing a hold or deposit at the time the Rental Auto is checked out;

2) Declines the full Collision Damage Waiver or similar option (CDW), or pays for a partial collision damage waiver, offered by the Rental Company;

3) Is the primary renter, which is defined as the Cardmember who is named on the written agreement with the Rental Company as the person renting and taking control and possession of the Rental Auto (“Primary Renter”); and

4) Uses the Card to pay for the entire auto rental from the Rental Company at the time of vehicle return. ”

El 24 de abril de 2001, Cabrera Car cargó a la tarjeta del Sr. Rigau la cantidad de $5,000 por concepto de los daños del vehículo. No obstante, AMEX le notificó al señor Rigau que no le sería exigido el pago de los $5,000 hasta que la compañía terminara su investigación sobre el accidente, y determinara si le extendería cubierta.
Seis meses luego, el 5 de noviembre de 2001, AMEX le notificó al Sr. Rigau que su reclamación había sido denegada. Ello, por alegadamente no haber utilizado la tarjeta AMEX para pagar la totalidad del arrendamiento.
El Sr. Rigau se comunicó con AMEX y le informó que en efecto había pagado la totalidad del alquiler con su tarjeta, pues el cargo total por el arrendamiento había sido ajustado a los $500 que se había cargado a la misma originalmente.
El 23 de enero de 2002, AMEX notificó nuevamente al Sr. Rigau que su reclamación había sido denegada, bajo el mismo argumento de que Cabrera Car no le había cargado a la tarjeta el monto total del arrendamiento. AMEX alegó que sólo se le cargó $500 mientras que el contrato de alquiler reflejaba que el monto total del mismo había sido $659.50. Por lo tanto, que él, Sr. Rigau, era responsable por los $5,000 de daños cargados a la tarjeta y pagados por AMEX a Cabrera Car.
Ante dicha situación, el 15 de febrero de 2002, el Sr. Rigau, por conducto de su representación legal, le notificó a AMEX las razones por las cuales entendía que la decisión de denegar su reclamación al seguro estaba errada. Además, le informó a AMEX que acudiría a los tribunales para impugnar cualquier intento de reclamarle los $5,000.
Poco después, AMEX notificó al Sr. Rigau que le estaba cancelando su cuenta debido a que no había pagado los $5,000. Además, el 1 de abril de 2002, le informó que comenzaría nuevas gestiones de cobro y que referiría su caso a una agencia de cobro. También le indicó que su cuenta podía ser notificada a las agencias de crédito, lo cual afectaría su historial crediticio.
*1044 Varias semanas más tarde, el Sr. Rigau comenzó a recibir llamadas y cartas de varias agencias de cobro, reclamándole los $5,000 que alegadamente le adeudaba a AMEX. Además, AMEX notificó la cuenta del Sr. Rigau como pérdida, a las diferentes agencias de crédito.
Así las cosas, el 7 de mayo de 2002, el Sr. Rigau presentó ante el TPI demanda por incumplimiento de contrato en contra de AMEX. Alegó que AMEX había incumplido la obligación contractual de proveerle cubierta bajo el “Car Rental Loss and Damage Insurance Plan,” y solicitó $25,000 en concepto de angustias y sufrimientos mentales por haber sido hostigado constantemente para que pagara los $5,000.
Luego de varios incidentes procesales, AMEX presentó demanda contra tercero en contra de Cabrera Car y del Sr. Wilson, como partes indispensables para la tramitación del caso. Cabrera Car contestó y negó toda responsabilidad. El Sr. Wilson nunca fue emplazado, así que no participó en el pleito.
Trabada la controversia, el TPI celebró el juicio en su fondo los días 21 de julio, 26 de octubre, y 8 de noviembre de 2004, y 14 de marzo, 22 de junio, y 24 de octubre de 2005. En el mismo, declararon tres personas: el Sr. Rigau, la señora Lydia García, representante de AMEX, y el Sr. Cabrera López.
El Sr. Rigau testificó extensamente sobre los daños que le causó AMEX al insistir en cobrarle los $5,000 de los daños sufridos por el vehículo de Cabrera Car en el accidente. En específico, testificó que debido a que AMEX notificó su cuenta como pérdida a las agencias de crédito, su historial crediticio se había afectado seriamente. Además, que se vio imposibilitado de adquirir un segundo automóvil para su esposa, con quien se había recién casado y quien era extranjera, por lo que no tenía historial de crédito propio. También declaró que la deuda reportada por AMEX causó que le aumentaran de 6.00% a 6.375%, la tasa de interés que tenía negociada para un préstamo hipotecario; y que ello representó un aumento de $35 al pago mensual de la hipoteca, lo cual equivale a $12,600 adicionales en intereses a lo largo de los 30 años de la hipoteca.
Por su parte, el Sr. Cabrera López declaró que había decidido condonar parte de la deuda luego de recibir una llamada telefónica de la Sra. Robles Rivera. Indicó que no se corrigió el contrato porque no se entendió necesario ni fue solicitado por AMEX durante el proceso de investigación y evaluación de la reclamación. Señaló, además, que se había comunicado por teléfono con AMEX para indicarle que le había condonado al Sr. Rigau la cantidad de $159.50 en controversia.
Por último, la Sra. García, representante de AMEX, se limitó a declarar que en efecto existía una diferencia de $159.50 entre la cantidad cargada a la tarjeta AMEX del Sr. Rigau y la cantidad que figuraba como monto total en el contrato de alquiler.
El TPI emitió Sentencia el 14 de agosto de 2006. En sus conclusiones de derecho, el Tribunal citó el Art. 1240 del Código Civil, 31 L.P.R.A. see. 3478, el cual establece que “la interpretación de las cláusulas obscuras de un contrato no deberá favorecer a la parte que hubiese ocasionado la obscuridad.” Se refirió, además, a la jurisprudencia del Tribunal Supremo de Puerto Rico que indica que este principio debe ser aplicado rigurosamente a los contratos de adhesión, particularmente a los contratos de seguro. Determinó el TPI que, en este caso, era ambiguo el cuarto requisito para que aplicara la cubierta de seguro de automóvil de AMEX, y por lo tanto que el Tribunal debía interpretarlo. Señaló lo siguiente:

“Nos toca resolver entonces si el hecho de que el Car Rental Inc. le hubiese otorgado un descuento al demandante en el precio del arrendamiento, impide la activación del contrato de seguros de autos de alquiler que nos ocupa. [...]

Por otro lado, el fin del cuarto requisito del contrato de seguro aquí impugnado es el de garantizar que AMEX reciba el porcentaje que le corresponde por el total del precio del arrendamiento. Dicho de otro modo, 
*1045
este requisito lo que persigue es el evitar que una persona separe el vehículo con la tarjeta AMEX y luego utilice otra forma de pago para cubrir la cantidad restante del arrendamiento, lo que disminuye la cantidad que AMEX cobra por sus servicios. En la situación del presente caso, no se afectaron los ingresos de AMEX. Como cuestión de hecho, el precio total del arrendamiento se pagó con la tarjeta AMEX del demandante.

[...] En la situación del presente caso, el demandante pagó el total de lo pactado por concepto del arrendamiento mediante su tarjeta AMEX. Así la cosa, no se afectaron los intereses de AMEX, por lo que se cumplió con el fin y el propósito del cuarto requisito. Al hacerse el ajuste en el precio del arrendamiento, AMEX no podía reclamar el pago de los $159.40, ya que dicha cantidad no fue adeudada realmente. ”

Por lo tanto, el Tribunal concluyó que AMEX no debió denegar la cubierta del seguro en las circunstancias de este caso. Ordenó que AMEX pagara los $12,600 por concepto de los intereses adicionales que tenía que pagar el Sr. Rigau en su préstamo hipotecario, y otorgó $50,000 por inconvenientes, vergüenza, angustias y daños mentales sufridos a consecuencia de haberse reportado a las agencias de crédito la alegada deuda reclamada por AMEX.
Más aún, el TPI condenó a AMEX a pagar $10,000 en honorarios de abogado, pues determinó que actuó temerariamente en la tramitación del caso. Señaló dicho foro que los argumentos expuestos por AMEX resultaron frívolos ante el claro estado de derecho aplicable y la prueba presentada durante la vista en su fondo.
Por último, desestimó la demanda contra Cabrera Car y condenó a AMEX a pagarle costas, gastos y $5,000 en honorarios de abogado.
Inconforme, oportunamente, AMEX apeló ante nos y le imputó los siguientes seis errores al foro de instancia:

“Erró el Honorable Tribunal de Instancia al determinar que la expresión ‘...use la tarjeta para pagar la totalidad del alquiler del vehículo de la Compañía de Alquileres al devolver el vehículo ’ en el Acuerdo Entre el Tarjetahabiente Dorado y American Express Travel Related Services Company, Inc. es “oscura” y por ello le aplica el Art. 1240 del Código Civil, 31 L.P.R.A. see. 3478.

Erró el Honorable Tribunal de Instancia al determinar que Cabrera no es responsable en modo alguno por los daños sufridos por Rigau, si es que algún daño éste tuvo.

Erró el Honorable Tribunal de Instancia al conceder daños especiales que no fueron reclamados en la Demanda ni detallado su concepto, ni probados, ni han sido padecidos.

Erró el Honorable Tribunal de Instancia al conceder daños generales que no fueron sufridos por Rigau, que él no cumplió con su deber de evitar y mitigar, o que AMEX-TRS no lo causó.

Erró el Honorable Tribunal de Instancia al conceder a Rigau una compensación desproporcionadamente alta y a todas luces punitiva.

Erró el Honorable Tribunal de Instancia al determinar que AMEX-TRS incurrió en temeridad al defenderse de la reclamación de Rigau y traer al pleito a Cabrera como tercero demandado. ”

El Sr. Rigau presentó alegato en oposición. Con el beneficio de las posiciones de las partes, procedemos a resolver.
II
En el primer señalamiento de error, AMEX impugna la conclusión del TPI de que la expresión “...use la *1046 tarjeta para pagar la totalidad del alquiler del vehículo de la Compañía de Alquileres al devolver el vehículo”, que aparece en el acuerdo entre ésta y sus tarjetahabientes, es “oscura”, y que por ello sea aplicable el Art. 1240 del Código Civil. Dicho artículo dispone, según anteriormente indicáramos: la interpretación de las cláusulas obscuras de un contrato no deberá favorecer a la parte que hubiese ocasionado la obscuridad. ”
El Artículo 1044 de Código Civil, 31 L.P.R.A. see. 2994, establece un principio general de la contratación: “[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos. ” Sobre este artículo, nuestro Tribunal Supremo señaló en Paine Webber, Inc. v. Soc. de Gananciales, 151 D.P.R. 307, 311 (2000), que “[pjacta sunt servanda es el sabio principio rector al que se enfrenta todo contratante. Compromiso y rigor es el tenor de este principio. Las partes se obligan a todos los extremos de lo pactado que sean conformes a la ley, la moral y el orden público. ”
Una vez se perfecciona un contrato, sus disposiciones se convierten en la ley entre las partes. No obstante, existen contratos que, debido a la diferencia entre el poder y capacidad para negociar de las partes, .serán interpretados flexiblemente a favor de la-parte más débil cuando surja controversia, sobre alguna de sus cláusulas. Entre estos se encuentra el llamado contrato de adhesión. En este contrato, “sólo una de las partes dicta las condiciones que ha de aceptar la otra. ” Arthur Young Co. v. Vega, 136 D.P.R. 157, 186 (1994).
El contrato de adhesión más común es el contrato de seguros. Sobre el contrato de seguros, el Tribunal Supremo expresó en López v. Atlantic Southern Ins Co., 158 D.P.R. 562, 568 (2003), que: “[l]os contratos de seguros, por ser considerados contratos de adhesión, deben interpretarse liberalmente a favor del asegurado, con el objetivo de sostener la cubierta por vía de una interpretación razonable. ” Esta expresión del Tribunal es cónsona con el mandato del Artículo 1240 del Código Civil, 31 L.P.R.A. see. 3478, supra, sobre cómo interpretar cláusulas obscuras o ambiguas.
En el recurso ante nos, AMEX alega que la cláusula cuatro del contrato con el Sr. Rigau no es oscura, y por lo tanto, que erró el TPI al aplicar el Art. 1240, supra. Dicha cláusula indica que, para que se active la protección del seguro, el tarjetahabiente deberá “usar la tarjeta para pagar por el arrendamiento completo al momento de regresar el vehículo. ” De su faz, la cláusula parece clara al efecto de que sólo se activara la protección del seguro si la persona que posee la tarjeta la utiliza para pagar la totalidad del arrendamiento.
No obstante, el TPI determinó que la cláusula es oscura en cuanto a la manera de cumplir con dicho requisito. El Sr. Rigau alega que cumplió con el mismo, ya que el arrendamiento le costó solamente $500 y dicha cantidad fue cargada, en su totalidad, a su tarjeta AMEX. AMEX, por su parte, arguye que no se cumplió con dicho requisito, porque no se pagó con la tarjeta la cantidad total de $659.50 que figura consignada en el contrato de arrendamiento.
Sin embargo, esa sospecha debió terminar cuando el propio presidente de Cabrera Car le aseguró a AMEX que el total cobrado al Sr. Rigau por al arrendamiento fue solamente la cantidad de $500, que fueron cargados originalmente a la tarjeta de éste. En esas circunstancias, AMEX debió investigar diligentemente los reclamos del Sr. Rigau de que los $159.50 adicionales que figuraban en el contrato le habían sido condonados. Dicha investigación requería un mínimo de esfuerzo, pero AMEX se aferró a su decisión inicial de denegar la cubierta a base de que la cantidad indicada en el contrato y la cantidad cargada a la tarjeta no eran iguales.
Entendemos que el TPI interpretó correctamente la cláusula en controversia. Aun si la misma no fuera una cláusula oscura, procedería interpretarla en contra de AMEX, a raíz de la prueba desfilada durante el juicio y de la normativa aplicable a los contratos de adhesión. No se cometió el error señalado.
En el segundo señalamiento, AMEX plantea que el TPI erró al liberar a Cabrera Car de toda responsabilidad por los daños causados al Sr. Rigau. Arguye que era responsabilidad de Cabrera Car corregir el *1047 contrato de arrendamiento si en efecto había condonado parte de la deuda. Según AMEX, el no corregirlo fue la causa del daño sufrido por el Sr. Rigau. No le asiste la razón.
No podemos estar de acuerdo en que la simple omisión de Cabrera Car, de no indicar en el contrato de arrendamiento que había condonado el balance de $159.50 de la deuda del Sr. Rigau, constituya razón suficiente para imponerle responsabilidad. No le corresponde a Cabrera Car hacer el trabajo de AMEX. AMEX tenía la obligación de honrar el contrato de seguro con el Sr. Rigau si éste cumplía con los requisitos necesarios. Por tanto, una vez el Sr. Rigau le informa que el balance de $159.50 no fue pagado por otro medio distinto a su tarjeta con AMEX, sino que le fue condonado, AMEX pudo requerir que ello le fuera acreditado a su satisfacción. No lo hizo. En contrario, cuando conforme surge de la prueba Cabrera Car se comunicó con AMEX para informar sobre la condonación, y sobre su disponibilidad para cooperar en aclarar la situación, AMEX prefirió ignorar la información que Cabrera Car le comunicó para quedar en posición de denegar la cubierta. Así surge de la transcripción de la prueba oral, cuando a preguntas del representante legal de AMEX sobre la condonación de los $159.50 al Sr. Rigau, el señor Kenneth Cabrera López, declarando por Cabrera Car, le contestó: “[n]o, no se puso por escrito. [...] Nosotros... yo llamé a American Express cuando ellos denegaron eso, para ver si entonces había una solución para que él pagara [...] dijeron que no se podía hacer nada. ” Dicho testimonio no fue controvertido. Además, AMEX no presentó prueba alguna para establecer que Cabrera Car estuviera impedida de hacerle descuentos a los tarjetahabientes de AMEX, al momento de su facturación final; ni presentó prueba alguna para establecer que Cabrera Car hubiese incumplido algún requerimiento de información de AMEX.
Por todo lo anterior, el TPI actuó correctamente al desestimar la demanda de AMEX contra Cabrera Car. No se cometió el- error señalado.
III
En el tercero, cuarto, y quinto señalamientos de errores, AMEX impugna los distintos daños concedidos por el TPI. Procedemos a discutirlos en conjunto.
La valoración del daño constituye elemento fundamental en nuestro ordenamiento jurídico. Conceder cuantías insuficientes por concepto de daños sufridos tiene el efecto de aminorar la responsabilidad civil a la que deben estar sujetas las actuaciones antijurídicas. Antonio J. Amadeo Murga, El Valor de los Daños en la Responsabilidad Civil, Tomo I, 1997, pág. 31. Por el contrario, una valoración exagerada daría lugar al elemento punitivo, ajeno a nuestro sistema de derecho.
Para que el sistema civil cumpla con sus propósitos, los tribunales debemos propiciar que se logre la más razonable proporción entre el daño causado y la indemnización concedida. Sin embargo, nuestro Tribunal Supremo ha reconocido que la función de valorar el daño es sumamente difícil, particularmente cuando se trata de valorar daños no patrimoniales o daños morales. Blàs v. Hosp. Guadalupe, 146 D.P.R. 267 (1998).
La preocupación por la dificultad y complejidad de valorar los daños ha sido manifestada por el Tribunal Supremo en reiteradas ocasiones. Así, en Riley v. Rodríguez de Pacheco, 119 D.P.R. 762, 805 (1987), indicó:

“La determinación de una compensación justa y razonable por los daños sufridos [es] tarea que constituirá un reto aun para un Salomón del siglo XX.” [Cita omitida]. La apreciación humana valorativa de elementos que no son ostensibles y visibles, sino intangibles]...], no está exenta de cierto grado de especulación. Aspiramos a que toda adjudicación sea razonablemente balanceada, esto es, ni extremadamente baja como tampoco desproporcionalmente alta.

La gestión judicial de estimación y valoración de daños es sumamente complicada y angustiosa porque “no existe una tabla o computadora electrónica que recoja todos los elementos y premisas inarticuladas que nutren *1048 la valoración del dolor físico y mental humano, y permita, mediante la aplicación de unas teclas o el oprimir unos botones, obtener el resultado final apropiado”. Urrutia v. A.A.A., 103 D.P.R. 643, 647 (1975).
La tarea de valorar el daño descansa inicialmente en el ejercicio discrecional prudente, juicioso y razonable del juzgador de hechos animado por un sentido de justicia y de conciencia humana. Urrutia v. A.A.A., supra. Los tribunales de instancia están en mejor posición que los tribunales apelativos para hacer dicha evaluación. Ello es así, ya que estos tribunales son los que tienen contacto directo con la prueba presentada en el proceso judicial de primera instancia. Id; Blas v. Hosp. Guadalupe, supra.
Así pues, a tenor con la referida norma de abstención judicial, los tribunales apelativos no deben intervenir con la estimación y valoración de daños que hagan los tribunales de instancia a menos que las cuantías sean ridiculamente bajas o exageradamente altas. Valldejuli Rodríguez v. A.A.A., 99 D.P.R. 917 (1971); Riley v. Rodríguez de Pacheco, supra; Urrutia v. A.A.A., supra. De ahí que la parte que solicita la modificación de las sumas concedidas a nivel de instancia venga obligada a demostrar la existencia de circunstancias que hagan meritorio modificar las mismas.
Al tenor de esta normativa, entendemos que AMEX no ha demostrado circunstancias que ameriten la reducción de los $50,000 concedidos por el TPI en daños generales. Luego de examinar los documentos que obran en autos, junto con la transcripción de la prueba testifical, no encontramos razón para abandonar las normas de abstención judicial y modificar la cuantía concedida por el TPI en este aspecto. AMEX no ha señalado prueba que impugne las determinaciones del TPI sobre la valoración de los daños sufridos por el Sr. Rigau. Por lo tanto, se debe sostener la suma concedida por daños generales.
Además de los daños generales, AMEX impugna la partida de $12,600 que concedió el TPI por concepto de los intereses adicionales que alegadamente tendrá que pagar el Sr. Rigau por el préstamo hipotecario que estaba gestionando. AMEX indica que esa partida constituye daños especiales que tenían que ser alegados en la demanda, y que al no ser alegados oportunamente fueron renunciados por el Sr. Rigau.
Los daños especiales han sido definidos por nuestro Tribunal Supremo de la siguiente manera: “Por un lado, se encuentran los daños especiales —también conocidos como daños físicos, patrimoniales, pecuniarios, o económicos — , que son toda aquella pérdida que recae sobre bienes objetivos. Estos daños admiten valoración económica por impactar directamente el patrimonio del perjudicado. ’’ Rivera v. S.L.G. Díaz, 165 D. P.R._, 2005 J.T.S. 121.
La Regla 7.4 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 7.4, dispone que “cuando se reclamen daños especiales, se detallarán las distintas partidas. ” El Tribunal Supremo ha señalado que, según esta Regla, si los daños especiales no son alegados en la demanda, se renuncian. Blás v. Hosp. Guadalupe, supra.
Luego de examinar los documentos que obran en autos, encontramos que el Sr. Rigau no alegó en la demanda los daños causados por el aumento en la tasa de interés de su préstamo hipotecario. Tampoco hay mención de dichos daños en el Informe Parcial sobre Conferencia Preliminar entre Abogados. La primera vez que se mencionan estos daños es durante el testimonio del Sr. Rigau en la vista de 21 de julio de 2004.
El Sr. Rigau alega que la Regla 13.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 13.2, permite enmiendas a las alegaciones mediante la prueba que desfile durante el juicio. Esta Regla establece lo siguiente:

“Cuando con el consentimiento expreso o implícito de las partes se sometan a juicio cuestiones no suscitadas en las alegaciones, aquéllas se considerarán a todos los efectos como si se hubieran suscitado en las alegaciones. [...] Si se objetare la evidencia en el juicio por el fundamento de ser ajena a las cuestiones suscitadas en las alegaciones, el tribunal podrá permitir las enmiendas y podrá hacerlo liberalmente, siempre 
*1049
que con ello se facilite la presentación del caso y la parte que se oponga no demuestre a satisfacción del tribunal que la admisión de tal prueba perjudicaría su reclamación o defensa. ”

De la transcripción del juicio, el 21 de julio de 2004, surge que AMEX objetó cuando el Sr. Rigau comenzó a declarar sobre los daños que le había causado el aumento en la tasa de interés de su préstamo hipotecario. El intercambio fue el siguiente:
“Sr. Rigau: Hice., traté de hacer un préstamo con First Bank para consolidar deudas de las tarjetas de crédito; traté de solicitar tarjetas de crédito para aprovechar unos intereses más bajos que habían. No lo pude lograr; me rechazaron el crédito... este..-. el préstamo personal que solicité con American... digo con First Federal, y en todas las ocasiones me lo denegaron. Luego, hice el año pasado... el año pasado yo me volví a casar, entonces, iba a comprar una residencia con mi esposa y como parte de los documentos que tuve que llevar, tuve que darle la explicación con un affidavit, [sic.] de que esta situación estaba en Corte todavía y, a pesar de todo eso, tuve que ... cuando cerramos el caso, pues cerré con medio punto sobre el interés que estaban ellos ofreciéndome, que era para clientes...

Ledo. García. Perez: Objeción.

Sra. Juez: ¿Cuál es el fundamento en Derecho?

Ledo García Perez: Sí, pero retiramos.

Sra. Juez: Es que... está totalizando porque si vamos a ver casos, se puede hacer de dos maneras; todo a la misma vez, aprovechar de daños y si yo resuelvo, pues, ya está todo cogido o está todo resolviéndose... o resolver primero el caso en sí y luego, si hay daños, digo perdóneme., la vista de daños. Yo preferiría hacerlo todo. Lo podemos escoger ahora mismo.

Ledo. García Pérez: Bueno, yo, ... la objeción fue fundamentada en eso.

Sra. Juez: ¿Cuál es el fundamento?

Ledo. García Pérez: Es que fue muy prematura. La retiro porque fue muy prematura.

Sra. Juez: ¿Por lo de los daños? Ser prematura en cuanto a qué?

Ledo. García Pérez: Es prematura en el sentido de que el no ha dicho que fue por razón del informe de crédito adverso que aparecía en la... en el informe de crédito.

Sra. Juez: Ha bueno! Puede sentar las bases sobre cómo era el crédito antes de ocurrir este incidente. ¿Es eso lo que usted quiere decir?

Ledo. García Pérez: Que él no es competente para decir las razones por las cuales cerró por medio crédito más.

Sra. Juez: No, pero ellos le explican las razones, pero me parece que lo que está buscando es...

Ledo. García Pérez: Ellos le explican, pues, entonces es “earsay” [sic.]. ”

Del diálogo anterior se puede observar que la representación legal de AMEX objetó el intento del Sr. Rigau de presentar prueba sobre los daños que le causó el aumento en la tasa de interés del préstamo hipotecario que *1050 estaba gestionando. No obstante, dicha objeción estuvo basada en el fundamento de que la prueba constituía prueba de referencia. No objetó bajo el fundamento de que se estaba presentando prueba ajena a las alegaciones, que era el correcto a los fines de impedir la presentación de prueba sobre daños y especiales.
De ordinario, la objeción por el fundamento incorrecto hubiese permitido que se presentara la prueba y se enmendaran las alegaciones. Sin embargo, la vista de 21 de julio de 2004 fue suspendida poco después del intercambio antes citado. En ese momento, el Sr. Rigau no logró declarar sobre el aumento en la tasa de interés de su préstamo.
Al continuar el juicio, el 26 de octubre de 2004, el Sr. Rigau intentó declarar nuevamente sobre los alegados daños por el aumento de la tasa de interés. En esa ocasión, la representación legal de AMEX objetó bajo el fundamento de que dicha prueba versaba sobre daños especiales que no habían sido alegados en la demanda, y que por tanto, habían sido renunciados. A pesar de la objeción de AMEX, el TPI decidió permitir el testimonio. Pero el Sr. Rigau no llegó a declarar sobre los daños especiales en dicha vista antes de que la misma quedara suspendida.
El juicio continuó el 8 de noviembre de 2004. En dicha vista, AMEX formuló por tercera ocasión su objeción al testimonio del Sr. Rigau sobre daños por el aumento en la tasa de interés de su préstamo hipotecario. El TPI denegó nuevamente la objeción de AMEX, bajo el fundamento de que la misma era tardía. El Sr. Rigau entonces procedió a declarar sobre cómo el estado de mal crédito que le provocó AMEX causó que le aumentaran la tasa de interés para el préstamo hipotecario que ya tenía negociado al surgir la controversia con AMEX.
Entendemos que el TPI abusó de su discreción al permitir el testimonio del Sr. Rigau sobre los daños especiales que no fueron alegados en la demanda. El Sr. Rigau arguye que, aunque AMEX objetó la prueba a tiempo, se enmendaron las alegaciones porque la objeción se hizo por el fundamento incorrecto. No le asiste la razón.
Aunque AMEX no objetó la presentación de prueba sobre daños especiales por el fundamento correcto en la primera ocasión, el Sr. Rigau no logró declarar en esa vista sobre los daños especiales porque la misma fue suspendida. Por lo tanto, las alegaciones todavía no habían quedado enmendadas. Así, cuando el Sr. Rigau intentó presentar la prueba nuevamente en la vista siguiente y AMEX objetó por el fundamento correcto, el TPI debió declarar con lugar dicha objeción. No empece a ello, el TPI decidió admitir el testimonio del Sr. Rigau, pero éste no llegó a declarar porque la vista fue suspendida nuevamente. En la vista siguiente, AMEX objetó por tercera ocasión dicha prueba, por segunda vez bajo el fundamento correcto, pero el TPI decidió permitirla. Ello, bajo el fundamento de que la objeción era tardía porque ya se habían enmendado las alegaciones por la prueba.
No obstante, no fue hasta luego de esa tercera objeción que el Sr. Rigau finalmente logró declarar sobre el referido aumento de tasa de interés, y cómo ésta había sido aumentada debido a las actuaciones de AMEX.
La Regla 13.2 de Procedimiento Civil, supra, le concede discreción al TPI para permitir enmiendas a las alegaciones liberalmente cuando éste entienda que así se facilita la presentación del caso. Pero no le concede discreción para permitir prueba sobre daños especiales que no fueron alegados en la demanda y fueron debidamente objetados al ser levantados durante el juicio. La jurisprudencia de nuestro Tribunal Supremo establece que si los daños especiales no se alegan en la demanda, se renuncian. Por lo tanto, si una parte objeta a tiempo por el fundamento correcto, prueba sobre daños especiales que no fueron alegados en la demanda, el TPI no tiene discreción para permitirla.
En resumen, el TPI erró al permitir el testimonio del Sr. Rigau sobre todo lo relacionado con el aumento en *1051 la tasa de interés del referido préstamo hipotecario, y al conceder daños especiales por $12,600 a base de dicho testimonio, exclusivamente. Por lo tanto, procede eliminar esa partida de la sentencia apelada.
IV
Por último, AMEX impugna la decisión del TPI de conceder honorarios de abogado al Sr. Rigau y a Cabrera Car.
La capacidad del Tribunal para conceder honorarios de abogado a una parte emana de la Regla 44.1 de Procedimiento Civil, 32 L.P.R.A. Ap. Ill, R. 44.1. Esta dispone, en lo pertinente:

“d) Honorarios de abogado. En caso que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta. ”

Nuestro Tribunal Supremo expresó en Sánchez Acevedo v. ELA, 125 D.P.R. 432, 439 (1990), que la concesión de honorarios de abogado “no es compulsoria y no pertenecen al abogado. Los honorarios por temeridad no se conceden para compensar al abogado por la labor realizada.”
La temeridad no está definida en la regla antes citada, pero el Tribunal Supremo ha expresado que “la temeridad es una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia.” Elba A.B.M. v. U.P.R., 125 D.P.R. 294, 329 (1990). De igual manera ha expresado que la imposición de honorarios de abogado por temeridad persigue castigar aquellos litigantes que obligan a otras personas a incurrir en gastos innecesarios al interponer pleitos frívolos, o alargar innecesariamente aquellos ya presentados. La imposición de honorarios por temeridad descansa en la discreción del Tribunal. Sin embargo, en aquellos casos en que los tribunales inferiores abusen de su discreción, los tribunales apelativos podrán revisar su actuación. Elba A.B.M. v. U.P.R., supra.
Luego de examinar la totalidad de los documentos que obran en autos, entendemos que el TPI no abusó de su discreción al conceder honorarios de abogado a favor del Sr. Rigau y de Cabrera Car.
y
Por los fundamentos antes expuestos, se modifica la Sentencia apelada para eliminar la partida de $12,600 por concepto de daños especiales; y, así modificada, se confirma.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones
ESCOLIO 2008 DTA 45
1. Véase, pág. 111 de la transcripción de la prueba oral, a las líneas 5-21.